CHIC MILLER'S CHEVROLET,
INC. Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Defendant.

No. CIV. 3:04CV41(JBA).

United States District Court,
D. Connecticut.

Jan. 14, 2005.

Erin L. Arcesi, Gerard S. Collins, Michael D. O'Connell, O'Connell, Flaherty & Attmore, Hartford, CT, for Plaintiff.

Tanya Tymchenko, Bingham McCutchen, Hartford, CT, John R. Skelton, Bingham McCutchen, Boston, MA, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 22]

ARTERTON, District Judge.

Plaintiff, operator of a Connecticut Chevrolet dealership, has brought suit against Defendant General Motors for breach of contract and violation of the Connecticut Franchise Act. Defendant moves for summary judgment on both claims as well as its counterclaims. For the reasons that follow, Defendant's Motion for Summary Judgment [doc. # 22] is GRANTED, but Defendant's request for attorney fees is denied.

### I. FACTUAL BACKGROUND

Chapin W. Miller has operated Chic Miller's Chevrolet, a General Motors (GM) dealership, in Bristol, Connecticut, since 1967. He began as a mail clerk with General Motors Acceptance Corporation (GMAC) and worked his way up through the ranks until acquiring the dealership. Through 2002, Chic Miller's Chevrolet won several service awards from GM.

As part of its operations, Chic Miller's entered into wholesale lending agreements, commonly known as floor financing plans, to enable it to purchase new vehicles from GM. At first, the dealership had floor financing through GMAC. Beginning in 2001, however, Miller believed that GMAC was charging interest "at an inappropriately high rate." Miller Aff. ¶ 17. Unable to negotiate GMAC's rates down, Miller obtained a substitute lending agreement,

with a lower interest rate, from Chase Manhattan Bank. In November 2002, Chase withdrew from providing further floor plan financing to Chic Miller's Chevrolet, and Miller was forced to look elsewhere. He applied to GMAC to resume the previous financing arrangement, but GMAC declined. In July 2003, Miller requested that GM intervene and encourage GMAC to extend credit, but GM never did and Miller was unable to obtain a loan either from GMAC or any other lender.

Miller alleges that "[w]hen [he] sought to resume using GMAC for floor plan financing, comments made to [him] by GMAC managers made it clear that they were 'punishing' [him] for having used Chase Bank for a period of time. GMAC managers also encouraged other lenders to avoid working with [him]." Miller Aff. ¶ 20. Based on GM's previous effort to enlist him in buying out another GM dealership in the Bristol area, Miller believed that GM was attempting to reduce the number of dealerships in that area from three to two. *Id.* at ¶ 24. Miller claims that GM's desire to winnow the dealerships in Bristol "would explain why GMC did not give Chic Miller's Chevrolet the kind of assistance that it traditionally has given to other established dealerships." *Id.*

Chic Miller's Chevrolet is operated pursuant to a Dealer Sales and Service Agreement ("dealership contract" or "the contract"). *See* Ragsdale Aff. [doc. # 21] Ex. A. Under Article 10, "Capitalization," the contract provides:

**10.2 Wholesale Floorplan**

To avoid damage to goodwill which could result if Dealer is financially unable to fulfill its commitments, Dealer agrees to have and maintain a separate line of credit from a creditworthy financial institution reasonably acceptable to General Motors and available to finance the Dealer's purchase of new vehicles in conformance with the policies and procedures established by General Motors. . . .

*Id.* at 13. Under section 13.1.11, General Motors may terminate the agreement for "Failure of Dealer to maintain the line of credit required by Article 10." Section 13 requires GM to give the dealer notice and 30 days to correct such a breach, and allows GM to terminate the agreement with 60 days notice if the breach is not remedied.

On December 20, 2002, GM sent a letter to Miller notifying him that, without an inventory financing arrangement, Chic Miller's Chevrolet was in breach of Section 10.2 of the dealership contract. Ragsdale Aff. Ex. C. An amended notice was sent on January 2, 2003. *Id.* at Ex. D. On March 7, 2003, GM sent another letter advising Chic Miller's that it was in breach of the agreement, stating that Miller's representations that he would obtain new financing or arrange to sell the dealership so far had not come to fruition, and giving the dealership until March 31, 2003, to find acceptable floor plan financing. *Id.* at Ex. G. Miller apparently was unable to do so. On May 14, 2003, GM notified Miller that it was terminating the dealership contract effective 90 days from receipt of the letter unless Miller obtained a floor plan before July 1. *Id.* at Ex. H.

In June 2003 Chic Miller's requested mediation pursuant to the terms of the dealership contract. The mediation was concluded, unsuccessfully, on October 1, 2003. Ragsdale Aff. ¶ 21.[1]

On January 9, 2004, GM sent another termination notice to the dealership, notifying Miller that GM was terminating the

---

1. GM asserts, and Plaintiff does not dispute, that parties then agreed that the effective date of termination of the contract was December 15, 2003. Ragsdale Aff. ¶ 21.

contract because the dealership was insolvent, in further breach of the contract. *Id.* at Ex. J. The parties dispute whether Chic Miller's is, in fact, insolvent, and the plaintiff has submitted an affidavit from its accountant stating that as of April 26, 2004, it had sufficient assets to cover its liabilities. Mollo Aff. [doc. # 36] ¶ 6.

On February 19, 2004, Miller entered into an agreement with Kenneth Crowley, owner of several automobile dealerships in Bristol, Plainville and Hartford, Connecticut, for the sale and purchase of Chic Miller's Chevrolet for $500,000. *See* Crowley Aff. Ex. 1. The agreement was contingent on GM's approval. When Crowley signed the agreement, he was planning to move the Chevrolet dealership and combine it with his existing Buick–Oldsmobile dealership. Ragsdale Aff. ¶ 35. By letter dated March 3, 2004, GM informed Miller that a combined Chevrolet–Buick dealership was contrary to GM's marketing plan, and that the relocation of Chic Miller's Chevrolet might be subject to protest by other Chevrolet dealers in a fourteen mile radius. *Id.* at Ex. N. In addition, GM took the position that its contract with Chic Miller's Chevrolet was terminated by the previous written notices, and therefore any transfer of the dealership would be "moot." *Id.* at ¶ 39. GM informed Miller that it did "not intend to approve the transaction as submitted." *Id.* at Ex. N. GM has not yet formally rejected the sale and purchase agreement.

On March 10, 2004, GM sent yet another termination letter to Miller. Ragsdale Aff.

Ex. P. This letter alleges that Chic Miller's Chevrolet was closed for business for seven consecutive days, between March 1 and March 8, 2004, in breach of the dealership contract.[2] Miller denies this allegation, asserting that the dealership was closed only between March 1 and March 5, 2004, due to a broken pipe that damaged the furnace in the building. Miller Aff. ¶ 26.[3] As an indication that the dealership was open for business, it points to an advertisement[4] published in The Bristol Press on March 8, 2004, stating: "Chic Miller Chevrolet Collision Repair Center is still open..." *Id.* at Ex. E. Miller also alleges that he sold one car from his dealership on April 14, 2004, but GM counters, without response, that it was a used car and that Miller has not bought any new cars from GM for resale since November 2002.

## II. PROCEDURAL BACKGROUND

On December 12, 2003, Chic Miller's Chevrolet filed suit against GM in the Connecticut Superior Court, Judicial District of Hartford. On January 12, 2004, GM removed the case pursuant to 28 U.S.C. § 1441(a), invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332. Notice of Removal [doc. # 1].

The plaintiff filed an Amended Complaint [doc. # 19] on March 15, 2004. The two-count complaint alleges: breach of contract for failing to assist the plaintiff in obtaining floor plan financing and failing to approve the sale of the dealership to Crowley; and violations of the Connecticut

---

**2.** Section 14.5.3 of the contract permits GM to terminate the agreement for "Failure of Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days." Ragsdale Aff. Ex. A at 21.

**3.** A sign posted on the door on March 1, 2003, stated: "CHIC MILLER'S CHEVROLET IS CLOSED. Please bring your vehicle to the

dealer of your choice. Thank you for your past patronage." Ragsdale Aff. ¶ 41, Ex. O.

**4.** Section 5.1.6 of the dealership contract provides: "Dealer agrees to advertise and conduct promotional activities that are lawful and enhance the reputation of Dealer, General Motors and its Products...." Ragsdale Aff. Ex. A at 6.

Franchise Act, Conn. Gen.Stat. § 42–133v, for failing to act in good faith in terminating the contract, failing to give proper notice of the termination,[5] and refusing to approve the sale. On March 25, 2004, GM filed an Amended Answer and Counterclaim [doc. # 20]. The counterclaim alleges that Plaintiff breached the dealership agreement by: failing to maintain floor plan financing enabling the dealership to purchase new vehicles from General Motors for resale to customers; becoming insolvent; and failing to conduct customary sales and service operations. GM also moves for summary judgment on its counterclaim that plaintiff should be denied the protections afforded by § 42–133v(g) of the Connecticut franchise statute and should be held liable for defendants' attorney fees because the litigation was brought in bad faith.

## III. STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001)(quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548); *see also Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–1224 (2d Cir.1994) ("the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some

5. Although plaintiff asserts an improper notice claim in his complaint, he has not briefed it in his Opposition to GM's Motion for Summary Judgment [doc. # 31] and the Court deems this claim abandoned.

metaphysical doubt as to the material facts" is insufficient. *Id.* at 586, 106 S.Ct. 1348 (citations omitted).

## IV. DISCUSSION

### A. Breach of Contract

Miller has alleged that GM breached the dealership contract in two ways: failing to assist Miller in obtaining floor plan financing; and failing to approve the sale of Chic Miller's Chevrolet to Kenneth Crowley.

#### 1. Floor Plan Financing

"Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985)). "Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal citation omitted).

■ Here, the Dealer Sales and Service Agreement is unambiguous. Article 10.2, entitled "Wholesale Floorplan," provides that *"Dealer agrees* to have and maintain a separate line of credit... available to finance the Dealer's purchase of new vehicles...." (emphasis supplied). This language places the responsibility on the dealer, not on GM or any other party, to obtain and maintain a floor plan lending arrangement. No obligations on the part of GM are mentioned anywhere in the article.

Miller argues, however, that two provisions of Article 5, entitled "Dealer's Responsibility to Promote, Sell, and Service Products," obligate GM to assist him with finding floor plan financing. Section 5.3, captioned "Customer Satisfaction," requires the Dealer to generally act in a way that satisfies GM customers, and then provides that "General Motors agrees to provide Dealer with reasonable support to assist Dealer's attainment of customer satisfaction." It continues by laying out a process by which GM will evaluate customers' satisfaction concerning each dealer. Ragsdale Aff. Ex. A at 7.

Section 5.4, entitled "Business Planning," reads:

General Motors has established a business planning process to assist dealers. Dealer agrees to prepare and implement a reasonable business plan if requested by General Motors. General Motors agrees to provide Dealer with information specific to its dealership, and if requested, *to assist Dealer in its business planning as agreed upon by Dealer and General Motors."*

*Id.* (emphasis supplied).

■ The plain language of Sections 5.3 and 5.4 shows them to be inapplicable to the issue of floor plan financing. First, nothing in Section 5.3 connects general concerns about "customer satisfaction" to the specific requirement that a dealer maintain floor plan financing. While customers might be dissatisfied should they not find a range of new vehicles available at the dealership, due to the dealership's inability to purchase new vehicles from GM, the issue of floor plan financing is addressed specifically in Section 10.2. It "is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" *Aramony v. United Way of Am.,* 254 F.3d 403, 413 (2d Cir.2001) (quoting *Restatement (Second) of Contracts* § 203(c) (1981)). Thus the general obligation of GM to "provide Dealer with reasonable support to assist Dealer's attainment of customer's satisfaction" cannot

be read as a specific requirement that GM assist a dealer in obtaining a floor plan line of credit where another contractual section expressly references only the dealer's agreed undertaking to obtain and maintain the requisite credit line.

Similarly, GM's agreement in Section 5.4 to help the Dealer with business planning does not apply to the issue of floor plan financing. The language of the section itself does not mention floor plan financing or include it specifically as part of a business plan. While floor plan financing generally could be part of a dealer's business plan, floor plan loans are specifically addressed in Section 10.2, which places the responsibility on the dealer, not GM, to obtain and maintain the required credit arrangement. The general obligation of GM "to assist Dealer in its business planning," *see* Section 5.4, does not negate the specific contractual obligation of the dealer to "have and maintain a separate line of credit ... available to finance the Dealer's purchase of new vehicles..." under Section 10.2.

Plaintiff argues that even if there is nothing in the language of the contract that obligated GM to assist him in obtaining floor plan financing, GM should have done so because it had done so in the past for other dealers and it had the ability to do so, as it could have pressured GMAC, its wholly owned subsidiary, to extend a loan.[6] Where the contract itself is unambiguous, the contract's "meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature," *Goodheart Clothing Co. v. Laura Goodman Enter., Inc.*, 962 F.2d 268, 272 (2d Cir.1992), such as "trade custom and usage," which "is not admissible to contradict or qualify [the] provisions" of an unambiguous contract. *Hunt*, 889 F.2d at 1277–78 (internal citations omitted). Therefore even if Plaintiff can demonstrate that GM had the ability to assist dealers in obtaining financing from GMAC and had done so in the past, that evidence is not admissible to modify what the written dealership contract obligated Plaintiff to do.

Miller further alleges that one reason he was unable to obtain floor plan financing is that GMAC was "'punishing' [him] for having used Chase Bank for a period of time" and that "GMAC managers also encouraged other lenders to avoid working with [him]." Miller Aff. ¶ 20. Miller does not provide any admissible evidentiary support for these allegations beyond the fact that Plaintiff used to use GMAC for its floor plan financing but switched to Chase for more advantageous terms. GMAC is not a defendant in this action, so even if Miller's assertions about GMAC's animus could be proved, its motivation for not lending to Plaintiff is not probative of whether Defendant GM acted in bad faith.

Therefore, the Court finds that there is no dispute of material fact concerning Chic Miller's lack of floor plan financing after November 2002. Article 10.2 of the dealership contract unambiguously places the burden on the dealer to find and maintain

---

6. The only references in the record concerning the relationship between GM and GMAC are Plaintiff's assertion that "General Motors Corporation has a substantial level of authority and ability to influence GMAC's decision making process on behalf of its dealers," "[GM] has traditionally given significant assistance to established dealers, including assistance in securing floor plan financing," and "one of the fundamental purposes for the existence of GMAC is to provide [floor plan] financing for GMC dealers," Miller Aff. ¶¶ 16–17, and Defendant's allegation that GMAC is "a separate corporation" independent of GM. *See* Defendant's Amended Answer ¶ 12 *et seq.* Any factual dispute inferable from these statements is not material, however, because the contract did not obligate GM to assist Miller in obtaining a floor plan even if it could have done so.

floor plan financing. Without floor plan financing, the plaintiff was in clear breach of Section 10.2 of the dealership contract, justifying GM's termination of the contract under Section 13.1.11 (GM may terminate contract for "[f]ailure of dealer to maintain the line of credit required by Article 10."). GM is entitled to judgment as a matter of law on its counterclaim on that basis and on the plaintiff's breach of contract claim insofar as it is based on GM's alleged failure to assist plaintiff in obtaining a floor plan.

### 2. Sale of Dealership to Crowley

Plaintiff also bases his breach of contract claim on GM's indication that it would refuse to approve the sale of Chic Miller's Chevrolet to Kenneth Crowley. The sale was proposed in February 2004, two months after Chic Miller's commenced this lawsuit, one month after GM asserted its counterclaim, and, more importantly, after GM terminated the dealership contract December 15, 2003.[7] Ragsdale Aff. Ex. H. The Court has previously found that GM's May 14, 2003 termination notice was justified because Chic Miller's Chevrolet breached the franchise contract by failing to maintain floor plan financing.

 Thus at the time the Crowley sale was proposed, Miller no longer had a franchise to transfer to Crowley.[8] "It is a general principle of contract law that an assignment operates to transfer to the assignee *only* those rights and interests possessed by the assignor." *See Glenn v.*

---

7. *See supra* n. 1. The undisputed date of December 15, 2003 precedes Miller's application to transfer the franchise to Crowley.

8. Although the Connecticut Franchise Act, Conn. Gen.Stat. § 42–133v(g), allows a dealer to sell or transfer a franchise for up to six months after the conclusion of litigation under some circumstances, Plaintiff does not meet the criteria for this safe harbor provision. *See infra,* § IV.B.

*Exxon Co., U.S.A.,* 801 F.Supp. 1290, 1297 (D.Del.1992) (*citing Restatement (Second) of Contracts* § 336, comment b (1981)) (emphasis in original). Therefore, "if a franchisor has established the necessary grounds and followed the required procedures, once the franchise is terminated the franchisee cannot sell the franchise, unless the parties have so agreed." *Auth. Foreign Car Specialists v. Jaguar Cars, Inc.,* No. 92–3760(HLS), 1994 U.S. Dist. Lexis 10631 at *10 (D.N.J. Feb. 28, 1994) (unpublished), *aff'd* 79 F.3d 1137 (3d Cir. 1994).[9] In *Authorized Foreign Car Specialists,* under facts similar to the instant case, a franchisee attempted to sell its car dealership to a successor dealer eight days after the effective date of a termination notice from the franchisor. Because the franchisee no longer had anything to sell, the franchisor was found not to have breached the dealership agreement by refusing to approve the transfer. *Id.* Here, Miller's franchise was terminated at the time he applied to transfer the franchise, so Miller had nothing left to transfer and GM could not be found to have breached the dealership contract by failing to approve the sale.

For the reasons above, GM is entitled to judgment as a matter of law on the plaintiff's breach of contract claim insofar as the claim is based on GM's indication that it would not approve the sale of the dealership to Crowley.

---

9. Even if termination has not yet taken effect, a franchisee is only entitled to transfer his interest in any period remaining. *Glenn,* 801 F.Supp. at 1297 (where plaintiff attempted to transfer gas station franchise after notice of termination but before expiration of 90 day notice period, plaintiff entitled to transfer only remaining days in that period); *see also Portaluppi v. Shell Oil Co.,* 869 F.2d 245 (4th Cir.1989).

## B. Connecticut Franchise Statute

In order to lawfully terminate a franchise under the Connecticut dealer statute, a franchisor must: provide notice that complies with statutory requirements; have "good cause" for the termination; and act "in good faith." Conn. Gen.Stat. § 42–133v(a);[10] *see also Richard Subaru, Inc. v. Subaru of New England,* 8 F.Supp.2d 164, 169 (D.Conn.1998).

■ "Good cause" exists if "[t]here is a failure by the dealer to comply with a provision of the franchise which is both reasonable and of material significance to the franchise relationship..." Conn. Gen. Stat. § 42–133v(b). According to James Ragsdale, Northeast Region Zone Manager for GM, floor plan financing is a material aspect of a dealership agreement because "without floor plan financing, a dealership is unable to purchase motor vehicle inventory, which, in turn, severely limits a dealership's ability to earn income from vehicle sales." Ragsdale Aff. ¶ 7. "If a dealership is without floor plan financing for an extended period of time, it will eventually lose its ability to generate revenues and become financially insolvent, and will not be able to conduct customary sales and service operations." *Id.* at ¶ 8. Miller does not dispute that floor plan financing is a material term of his franchise contract with GM. As discussed above, GM was justified under the contract in terminating Miller's franchise for

failure to maintain floor plan financing. Because that term is material to the agreement, GM had "good cause" under the Connecticut dealer statute for terminating the franchise because of Miller's uncured breach.[11]

■ GM also had good cause to terminate the contract because it has shown that Chic Miller's Chevrolet failed to conduct customary sales and service operations between March 1 and March 8, 2004. A sign posted on the door of the dealership during that time stated: "CHIC MILLER'S CHEVROLET IS CLOSED. Please bring your vehicle to the dealer of your choice. Thank you for your past patronage." Ragsdale Aff. ¶ 41, Ex. O. Although Miller asserts that the dealership was only temporarily closed for repair, the sign does not say that the dealership would reopen, and the phrases "bring your vehicle to the dealer of your choice" and "thank you for your past patronage" certainly suggest permanent closure, not a burst water pipe. Miller points to one newspaper advertisement for body work business on March 8, 2004 and one car sale on April 14, 2004, *see* Miller Aff. ¶ 29, 40, during the time he claims he was open and operating his business. This evidence vastly is insufficient to show the conduct of regular, customary sales and service operations, which is a material part of the franchise agreement, and Section 14.5.3 of the dealership contract permits GM to ter-

---

**10.** "Notwithstanding the terms, provisions or conditions of any franchise agreement and notwithstanding the terms or provisions of any waiver, no manufacturer or distributor shall cancel, terminate or fail to renew any franchise with a licensed dealer unless the manufacturer or distributor has satisfied the notice requirement of subsection (d) of this section, has good cause for cancellation, termination or nonrenewal and has acted in good faith." Conn. Gen.Stat. § 42–133v(a).

**11.** Although the Connecticut state courts have yet to interpret the Connecticut "good cause"

requirement, failure to maintain floor plan financing was held to be good cause for terminating a car dealership under the Maryland franchise statute, which is similar to Connecticut's. *Hale Trucks of Md. v. Volvo Trucks N. Am.,* 224 F.Supp.2d 1010, 1028 (D.Md.2002), interpreting Md.Code Ann., Transp. II, § 15–209(b) (2001) ("A distributor may not terminate, cancel, or fail to renew the franchise of a dealer, notwithstanding any term or provision of the franchise, unless: The dealer has failed to comply substantially with the reasonable requirements of the franchise...").

260

minate the agreement for "[f]ailure of the Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days." Ragdsdale Aff. Ex. A at 21. Since that term is material to the agreement, GM had "good cause" under the Connecticut dealer statute for terminating the franchise because of Plaintiff's breach.

Chic Miller's Chevrolet alleges that by "prematurely seeking the ultimate remedy of termination of the dealership franchise, the Defendant has not acted in good faith...." Amended Compl. [doc. # 19] ¶ 40. The undisputed record shows that GM extended the period several times for Miller to try to obtain replacement floor plan financing after his arrangement with Chase ended. GM first notified Plaintiff of its breach of the dealership contract on December 20, 2002, with an amended notice on January 2, 2003, see Ragsdale Aff. Ex. D, and under the terms of the contract it could have canceled the franchise after 30 days of that notice. However, on March 7, 2003, GM extended the deadline until March 31, and when Miller was still unable to find a lender, GM gave him another extension until July 1. Id. at Ex. G, H. GM also prepared two letters at the request of Chic Miller's counsel stating that the dealership would be in good standing with GM upon reinstatement of its floor plan financing arrangement. Id. at Ex. E, F. While Miller may have expect-ed, based on GM's past practices, more than GM provided to him, Miller has not offered evidence to show that GM was acting "prematurely" or in bad faith during the course of the dealings recounted above.

■ Plaintiff argues that GM was acting in bad faith because of its "grand plan to reduce the market place [in the Bristol area] from three to two [Chevrolet] dealers." Pl. Opp. to Def. Motion for Summary Judgment [doc. # 31] at 12. However, a long term plan that called for reducing the number of dealerships in a possibly oversaturated market is not alone evidence of bad faith.

Because Plaintiff has not offered evidence from which a factfinder could conclude that GM acted without good cause or good faith,[12] GM is entitled to judgment as a matter of law on Plaintiff's claims under the Connecticut Franchise Act.

■ Defendant further asserts that Plaintiff is not entitled to the six month grace period under the Franchise Act. See Conn. Gen.Stat. § 42–133v(g).[13] The statute provides that the filing of a lawsuit challenging the termination of a franchise tolls the effective date of the termination for six months after the court's judgment, with several exceptions, including:

(A) Insolvency of the dealer, or filing of any petition by or against the dealer under any bankruptcy or receivership

12. Plaintiff's complaint asserts that GM "failed to comply with the notice provisions of the Connecticut Franchise Act," Amended Compl. ¶ 35, but Plaintiff has not briefed the issue and the Court deems it abandoned. See supra n. 5.

13. "If a franchisee brings an action in a court of competent jurisdiction to challenge the cancellation, termination or nonrenewal of a franchise agreement by a manufacturer or distributor under this section, such franchise agreement shall remain in full force and effect and such franchisee shall retain all rights and remedies pursuant to the terms and conditions of such franchise agreement, including, but not limited to, the right to sell or transfer such franchisee's ownership interest, for a period of six months following a final determination by the court of competent jurisdiction, unless extended by the court of competent jurisdiction for good cause. This subsection shall not apply to a cancellation, termination or nonrenewal of a franchise agreement based upon any of the reasons set forth in subdivision (3) of subsection (d) of this section" [quoted in text above]. Conn. Gen.Stat. § 42–133v(g).

law; (B) failure of the dealer to conduct customary sales and service operations during business hours for seven consecutive business days, except in circumstances beyond the direct control of the dealer . . .

Conn. Gen.Stat. § 42–133v(d)(3).

As discussed *supra,* GM has shown that Chic Miller's Chevrolet failed to conduct customary sales and service operations for seven consecutive business days between March 1 and March 8, 2004.[14] For this reason Plaintiff is not entitled to the six month grace period provided in Conn. Gen. Stat. § 42–133v(g). The six month safe harbor is intended to allow a franchisee to continue to operate or transfer a viable franchise during and after a legal dispute, so the safe harbor logically would not apply to a franchise that has gone out of business. Thus Chic Miller's Chevrolet is not entitled to the safe harbor of § 42–133v(g).

### C. Attorney Fees

GM argues that it is entitled to costs and attorney fees incurred in connection with defending this lawsuit because Plaintiff filed it in bad faith and solely for the purpose of delay.[15] Although the Court has found that GM is entitled to summary judgment on both claims in Plaintiff's complaint, GM has not shown that the complaint was made totally in bad faith.

Based on his previous course of dealing with GM over 40 years and his knowledge of GM's treatment of and assistance to other established dealerships, Miller cannot be said to have had no basis for claiming that GM's intolerance of his breach was a bad faith method for accomplishing its business goals of eliminating one dealership—a belief remotely supported by a 1998 statement of GM area manager Prestoy—or that GMAC's animus could be attributable to GM, even though Plaintiff ultimately could not marshal evidence to elevate these claims beyond mere metaphysical belief. A party may be sanctioned for filing a meritless lawsuit solely for the purpose for delay, and the Connecticut Franchise Statute's six month grace period after the disposition of a lawsuit could be used as a vehicle for delay. However, although the Court has determined that Miller is not entitled to the grace period, the Court cannot find that filing suit to preserve the status quo to test his bad faith claim, while without merit, was so abjectly lacking in any arguable basis to justify the significant sanctions sought. Therefore, GM's motion for attorney fees is denied.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [doc. # 22] is **GRANTED** as to both counts of Plaintiff's complaint and Defendant's counterclaim under Conn. Gen.Stat. § 42–133v(g), but denied as to the request for attorney fees. Defendant's request for oral argument [doc. # 27] is **DENIED AS MOOT.** The Clerk is directed to close this case.

IT IS SO ORDERED.

---

**14.** Although GM also asserts that Chic Miller's Chevrolet was insolvent, the Mollo affidavit arguably contradicts this allegation, *see* Mollo Aff. ¶ 6, and the Court's decision does not rest on this basis.

**15.** GM asserts in its summary judgment papers that Rule 11 of the Federal Rules of Civil Procedure also entitles it to attorney fees. GM Mem. of Law in Support of Motion for Summary Judgment [doc. # 23] at 24. However, a "motion for sanctions under [Rule 11] shall be made separately from other motions or requests," Fed.R.Civ.P. 11(c)(1)(A), and therefore is improperly brought as part of Defendant's summary judgment motion.