**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0132n.06

No. 08-4667

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 02, 2010**
LEONARD GREEN, Clerk

THOMAS D. GANLEY, KENNETH G. GANLEY, and GANLEY, INC.,

    Plaintiffs-Appellants,

v.

MAZDA MOTOR OF AMERICA, INC., d/b/a Mazda North American Operations,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

On Appeal from the United States District Court for the Northern District of Ohio

Before:    BOGGS and COOK, Circuit Judges; and COLLIER, Chief District Judge.[*]

    BOGGS, Circuit Judge. Plaintiffs – a corporation that owns and operates automobile dealerships, its controlling shareholder and his son – sue Mazda Motor of America, Inc. ("Mazda") for breach of contract and the violation of Ohio's statute governing automotive franchises. In particular, plaintiffs allege that Mazda unreasonably refused its consent to a proposed transfer of the majority interest in the corporation from the controlling shareholder to his son. The district court granted summary judgment to Mazda on all claims. For the following reasons, we affirm.

**BACKGROUND**

---

    [*]   The Honorable Curtis L. Collier, Chief Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation.

No. 08-4667
Thomas D. Ganley, et al. v. Mazda Motor of America, Inc.

## I. Underlying Events

Plaintiff Ganley, Inc. operates a number of automobile dealerships in northeast Ohio. Its controlling shareholder and president is plaintiff Thomas D. Ganley ("Thomas"). In 1983, Ganley, Inc. entered into a franchise agreement (the "Agreement") with Mazda allowing Ganley, Inc. to sell and service Mazda cars at a dealership in Parma, Ohio. The only signatories to the Agreement were Ganley, Inc. and Mazda; Thomas was not a signatory in his individual capacity. Among other things, the Agreement specified that Mazda's consent was required before a controlling interest in Ganley, Inc. could be sold or transferred, but also provided that such consent "shall not be unreasonably withheld."

In the late 1990s, Ganley, Inc.'s Mazda dealership took a turn for the worse. Not only was it unprofitable, but moreover, under all of Mazda's measures of sales performance, it ranked last in the entire state. Consequently, on March 11, 2003, following the procedures prescribed by the Ohio Motor Vehicle Dealers Act, Ohio Rev. Code § 4517.01 et seq. ("Dealers Act"), Mazda sent Ganley, Inc. a notice that it intended to terminate the franchise. As permitted under the Dealers Act, Ganley, Inc. filed a protest of the impending termination (the "Termination Protest") with the Ohio Motor Vehicle Dealers Board (the "Board"). This required Mazda to refrain from acting until the Board held a hearing and issued a finding as to whether there was good cause for the termination.

On October 29, 2003 – six days before the hearing was to commence – Ganley, Inc. submitted to Mazda a request for its approval of a "gift" of the controlling interest in Ganley, Inc. (the "Proposed Transfer") from Thomas to his son, plaintiff Kenneth G. Ganley ("Kenneth"). Simultaneously, Ganley, Inc. filed a motion with the Board to stay the proceedings with respect to

- 2 -

No. 08-4667
Thomas D. Ganley, et al. v. Mazda Motor of America, Inc.

the Termination Protest. The Board denied the stay, and the hearing in the Termination Protest took place on November 4 and 5, 2003.

On November 24, 2003, after the hearing, but before any decision, Mazda denied its consent to the Proposed Transfer, citing Ganley, Inc.'s failure to submit certain information necessary to evaluate the proposal. On December 26, 2003, Ganley, Inc. resubmitted the Proposed Transfer with additional supporting information, including Kenneth's proposed business plan for making the dealership profitable again. The plan contained five points of action, including the appointment of several dedicated Mazda salespeople and a dedicated Mazda service advisor (either through new hiring or reassignment of current employees' job duties), the separation of Ganley, Inc.'s Mazda advertising budget from its other brands, and the removal of Volkswagen automobile sales from the premises. However, Kenneth did not propose to relocate the dealership; upgrade the facility (other than signage); or replace Ganley, Inc.'s existing Service Manager, Parts Manager, General Sales Manager, or Office Manager. In his plan, Kenneth stated that turning the franchise around "[would] take time" and that "[o]nce [he had] staffed the front end properly and [was] sell[ing] 50-60 new units per month, [only then would he] begin focusing on fixed operations."[1]

In January 2004, Mazda sent a letter once again refusing to consent to the Proposed Transfer (the "Turn-Down Letter"). This letter stated (1) that the "dealership has been terminated and [thus there was] no Mazda dealership to transfer"; (2) that, even if something remained to be

---

[1] "Fixed operations" refers to a dealership's non-sales departments, including service, parts, and body shop. *See* Fixed Ops Magazine, http://www.fixedopsmag.com/ (last accessed Feb. 22, 2009).

transferred, the transfer was denied on account of Kenneth's failure to meet Mazda's transfer

evaluation criteria; and (3) that, in any event, Mazda planned to exercise its right of first refusal

under the Agreement. On February 2, 2004, pursuant to the Dealers Act, Kenneth filed a separate

protest with the Board, claiming that Mazda had denied the Proposed Transfer without good cause

(the "Transfer Protest").

After Kenneth filed the Transfer Protest, Ganley, Inc. again petitioned the Board for

a stay of the Termination Protest proceedings. The Board denied the stay, reasoning as follows:

> Nothing in [the Dealers Act] requires proceedings to be stayed under these circumstances. Kenneth . . . [is to] receive[] a gift from his father of stock in a dealership, which [is] subject to a termination. . . . Further, Thomas . . . is clearly an owner of stock in a dealership and can only assign whatever contractual rights that owner has. In this case it is stock in a dealership subject to a termination notice. . . . Ordering a stay of proceedings at this point primarily because Thomas . . . has attempted to transfer an interest in property to his son Kenneth would be enlarging [Thomas's] . . . contractual or statutory rights in a way that would be clearly unfair to Mazda. The [Dealers Act] requires a manufacturer not to terminate, discontinue, or fail to renew a franchise before the holding of a hearing on any protest filed. That section does not permit the franchisee to transfer its interest and stay a protest.

On April 30, 2004, the Board's hearing examiner issued a report and recommendation

in the Termination Protest finding that Mazda had good cause to terminate the franchise. The Board

adopted the examiner's recommendation. Subsequently, Mazda terminated the franchise, and

Ganley, Inc. ceased selling Mazda cars in May 2004. Ganley, Inc. appealed the Board's

determination in the Termination Protest to the Ohio Court of Common Pleas, but the appeal was

dismissed for failure to prosecute.

Meanwhile, on June 25, 2004, Kenneth informed the Board that he was voluntarily

withdrawing the Transfer Protest. At that point, no discovery had been taken and no hearings had

been held in connection with that proceeding. Kenneth's withdrawal notice did not specify whether he intended that the Transfer Protest be dismissed with or without prejudice. On July 16, 2004, the Board issued a "Final Adjudication Order" stating that the Transfer Protest was dismissed "with prejudice." Kenneth did not seek rehearing or appeal the Board's order to the Ohio Court of Common Pleas, as he was permitted to do under the Dealers Act. To this day, Thomas has not transferred his interest in Ganley, Inc. to Kenneth and remains its controlling shareholder.

## II. Mazda's "Gateway Criteria"

Plaintiffs' claims with respect to the Proposed Transfer hinge on the misapplication of the criteria Mazda utilizes in screening transfer proposals (the "Gateway Criteria"), which are set forth in an internal policy memorandum (the "Gateway Memorandum"). The Gateway Criteria involve the analysis of customer satisfaction index ("CSI") scores for the proposed transferee's existing dealerships. In particular, for each such dealership, one point is awarded if the sales component of that dealership's CSI score equals or surpasses 95% of the relevant automobile manufacturer's national average, and an additional point is awarded if the service component of that dealership's CSI score equals or surpasses 95% of the relevant manufacturer's national average. According to the Gateway Memorandum, a proposed transferee "pass[es] gateway" if he or she attains *51% or more* of all available points.

The Gateway Memorandum places two relevant restrictions on the consideration of a proposed transferee's existing dealerships. First, if the proposed transferee does not own at least 20% of the interest in a given dealership, that dealership must be left out of the calculation.

Secondly, if a dealership does not have "at least 12 months of CSI [data]" available to be examined, that dealership must also be left out.

The Gateway Memorandum emphasized that "[i]t is vital that [the] polic[ies therein] continue to be implemented on a consistent basis." There is no dispute that satisfaction of the Gateway Criteria was necessary for a given transfer proposal to be approved. Plaintiffs further assume that passing the Gateway Criteria was *sufficient* for approval; Mazda, on the other hand, asserts that the "[G]ateway [C]riteria exist as a threshold barrier to the consideration of prospective transfer candidates" and are "merely the first step in [the] approval process . . . ."

When Mazda applied the Gateway Criteria to Kenneth, it included CSI data for six dealerships in which he owned an interest: Mercedez-Benz, Lincoln/Mercury, Dodge, Chevrolet, Subaru, and Ford. Two of two possible points were awarded for the Mercedez-Benz and Lincoln/Mercury dealerships. One of two possible points was awarded for the Chevrolet dealership. Zero points were awarded for the Dodge, Subaru, and Ford dealerships. Thus, in total, Kenneth received five of twelve possible points (i.e., 41.7%). Because this was less than 51% of the total points available, Mazda concluded that Kenneth had failed to satisfy the Gateway Criteria.

However, it is undisputed that Kenneth owned less than 20% of the interest in the Ford dealership. Therefore, according to the Gateway Memorandum, that dealership should not have been considered. It is also undisputed that only ten months of CSI data were available for the Subaru dealership. Thus, that dealership, too, should have been left out of the analysis. If Mazda had left out *one* of these two dealerships, Kenneth would have scored five of ten possible points (i.e., 50%), still a failing score. However, if Mazda had faithfully followed the Gateway Memorandum and left

out *both* of these dealerships, Kenneth would have scored five out of eight possible points (i.e., 62.5%), which would have been sufficient to pass. Although the Subaru dealership's score was based on less than the required twelve months of data, Mazda asserts – and plaintiffs do not dispute – that the Subaru dealership's year-to-date score after ten months was "so low that it was mathematically impossible" for that dealership to bring its score up to 95% of Subaru's national average in the remaining two months of the year, even if it performed perfectly for those two months.

## III. Procedural History

On August 24, 2004, Ganley, Inc., Thomas, and Kenneth filed suit in Ohio state court, alleging that Mazda's refusal to approve the Proposed Transfer breached the Agreement and violated the Dealers Act. On October 1, 2004, Mazda removed the case to federal court on the basis of diversity. After discovery, Plaintiffs and Mazda filed cross-motions for summary judgment. On November 6, 2008, the district court denied plaintiffs' motion and entered summary judgment in favor of Mazda on all claims. In particular, the district court held that plaintiffs' Dealers Act claim was res judicata because the Board had dismissed the Transfer Protest "with prejudice" and that plaintiffs' contract claim failed for lack of damages. Plaintiffs timely appealed.

### DISCUSSION

## I. Standard of Review

We review de novo a district court's order granting summary judgment. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In reviewing the district court's decision, we view all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alterations in *Moldowan*).

## II. Dealers Act Claim

## A. Relevant Statutory Provisions

Among other things, the Dealers Act prohibits manufacturers from refusing consent to the transfer of a dealership, or a controlling interest therein, without good cause:

> A franchisor shall not fail or refuse to approve the sale or transfer of the business and assets or all or a controlling interest of a new motor vehicle dealer to, or refuse to continue the franchise relationship with, the prospective transferee after the holding of a hearing on any protest if the board determines that good cause does not exist for the franchisor to fail or refuse to approve such a sale or transfer.

Ohio Rev. Code § 4517.56(D).

This same section of the Dealers Act sets out the procedure that must be followed when a franchisee seeks a manufacturer's approval of a transfer:

> If the sale or transfer of the business and assets or all or a controlling interest in the capital stock of a new motor vehicle dealer contemplates or is conditioned upon a continuation of the franchise relationship with the franchisor, and the proposed transferee has indicated a willingness to comply with all of the requirements of the franchise then in effect, the franchisee shall notify the franchisor of such intention by

> written notice . . . . *The franchisor shall evaluate the prospective transferee and the transferee's prospective management personnel on the basis of reasonable and objective criteria fairly and objectively applied. . . .*

> The franchisor shall provide the franchisee and the prospective transferee with written notice by certified mail of any refusal to approve a sale or transfer of the business and assets or all the business and assets or a controlling interest in the capital stock of a new motor vehicle dealer within thirty days of receipt of the written notice advising of the proposed transfer. The notice shall specify the objective criteria used to evaluate the prospective transferee and the criteria which the transferee failed to meet.

Ohio Rev. Code § 4517.56(A)-(B) (emphasis added).

The statute specifies a number of circumstances that, in and of themselves, "do not constitute sufficient good cause for failing to approve a sale or transfer . . . ," although "the [B]oard may consider these circumstances among others in determining whether good cause [does or] does not exist . . . ." Ohio Rev. Code § 4517.56(E). Among the listed circumstances is "[t]he fact that the franchisor has previously determined to discontinue the franchise relationship with the transferor . . . ." *Ibid.*

The Dealer's Act provides that "[w]hen a franchisor . . . refuses to approve the sale or transfer of the business or a controlling interest in a franchisee for other than good cause, the franchisee or prospective transferee may, in lieu of filing a protest with the motor vehicle dealers board," file suit in court. Ohio Rev. Code § 4517.65(B). If the plaintiff succeeds, "the franchisor shall be liable . . . in double the amount of actual damages sustained, plus court costs and reasonable attorney fees." Ohio Rev. Code § 4157.65(A). In such an action, "[t]he burden of proof to establish the franchisor's good cause shall be on the franchisor . . . ." Ohio Rev. Code § 4157.65(D).

No. 08-4667
Thomas D. Ganley, et al. v. Mazda Motor of America, Inc.

**B. Is the Dealers Act Claim Barred by Res Judicata?**

The district court did not reach the merits of plaintiffs' Dealers Act claim because it held that the Board's dismissal of the Transfer Protest "with prejudice" precludes further litigation of that claim. We disagree.

Under Ohio law, "[r]es judicata acts as a bar to relitigation of an adjudicated claim between parties and those in privity with them." *Fender v. Miles*, No. CA2009-01-003, 2009 WL 3808518, at *3 (Ohio Ct. App. Nov. 16, 2009). There is no dispute that proceedings before the Board are capable of preclusive effect, *see Ganley v. Subaru of Am., Inc.*, No. 07CA0092-M, 2008 WL 2789274, at *7-*9 (Ohio Ct. App. July 31, 2008), or that Ganley, Inc. and Thomas are in privity with Kenneth, the party who filed the Transfer Protest, *see id.* at *9 (holding that parties were in privity where the claims raised in court were identical with those raised before the Board, parties "did not seek individually tailored results," and parties "had a mutuality of interest").

Rather, at issue here is whether plaintiffs' Dealers Act claim has actually been litigated in the first place.

> Determinations made in administrative proceedings are given preclusive effect (1) only if the parties had a full and fair opportunity to litigate the matters involved and (2) if the proceedings culminated in a definitive resolution of the matters. Thus, it is clear that an administrative agency must actually render a valid and final judgment upon the merits of an action before the doctrine of res judicata may be applied.

*In re Lima Mem'l Hosp.*, 675 N.E.2d 1320, 1323 (Ohio Ct. App. 1996) (internal quotation marks and citations omitted). In *Lima Memorial Hospital*, the Ohio Court of Appeals held that res judicata did not apply where the plaintiffs had "voluntarily dismissed [the proceeding] prior to an adjudication hearing before the [administrative board]" such that "no evidence was presented to the board, nor

- 10 -

did the board adjudicate the parties' claims." *Id.* at 1323. Plaintiffs argue that, because Kenneth similarly withdrew the Transfer Protest before any evidence was submitted and before a hearing was held, the abortive proceeding has no preclusive effect.

The district court held to the contrary on the ground that the Board issued what was styled a "Final Adjudication Order" ordering the Transfer Protest dismissed "with prejudice." Under Ohio law, a dismissal "with prejudice" is considered an adjudication on the merits which has preclusive effect, even where the dismissal was voluntarily sought. *Tower City Props. v. Cuyahoga County Bd. of Revision*, 551 N.E.2d 122, 124 (Ohio 1990) ("If the [voluntary] dismissal is with prejudice, the dismissed action in effect has been adjudicated upon the merits, and an action based on or including the same claim may not be retried." (quoting *Chadwick v. Barba Lou, Inc.*, 431 N.E.2d 660, 663 (Ohio 1982)).

Plaintiffs rejoin that the Board's dismissal "with prejudice" was null and void, as Kenneth's notice of voluntary dismissal instantly divested the Board of jurisdiction to issue further orders. Under Rule 41(A) of the Ohio Rules of Civil Procedure, "a plaintiff, without order of court, may dismiss all claims . . . by . . . filing a notice of dismissal at any time before the commencement of trial . . . ." Further, "[u]nless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice . . . ." *Ibid.* As the Ohio courts have held, "[t]he distinctive feature of a Civ. R. 41(A) voluntary dismissal, with or without prejudice, is that it is a self-executing act of a party undertaken without judicial intervention." *Howard v. Schutte*, No. 94-2432, 1995 WL 92268, at *2 (Ohio Ct. App. Feb. 17, 1995). In other words, "[t]he mere filing of the notice of dismissal [pursuant to Rule 41(A)] with the clerk of courts completely divests the court of jurisdiction." *Rini*

- 11 -

*v. Rini*, No. 80225, 2002 WL 31667239, at *2 (Ohio Ct. App. Nov. 27, 2002). Thus, under the Ohio

Rules of Civil Procedure, as soon as Kenneth filed his notice of dismissal, this "self-executing act"

terminated the proceeding *without* prejudice, and the Board had no jurisdiction to issue its

subsequent order. *See ibid.* ("Upon the filing of the notice of dismissal, the lower court was divested

of any jurisdiction to thereafter dismiss with prejudice the appellant's motions.").[2]

Mazda correctly points out in response that the Ohio Rules of Civil Procedure "are

not binding in adjudicatory proceedings before administrative agencies." *Vaughn v. State Med. Bd.*,

No. 90AP-1160, 1991 WL 150950, at *3 (Ohio Ct. App. Aug. 6, 1991). However, while Ohio Rule

of Civil Procedure 41(A) thus does not govern Board proceedings *ex proprio vigore*, both the United

States Supreme Court and the Ohio Supreme Court have stated that, barring a statute or

administrative rule to the contrary, "the power of a[n administrative] commission to refuse the

dismissal of a proceeding [without prejudice] on motion of the one instituting it could be no greater

---

[2] Because "Ohio Civ. R. 41 [is] modeled after its Federal counterpart," *Sec. Nat'l Bank & Trust Co. v. Reynolds*, No. 2007 CA 66, 2008 WL 3586906, at *5 n.3 (Ohio Ct. App. Aug. 15, 2008), the soundness of plaintiffs' argument is illustrated by the widespread agreement among the federal courts of appeals that orders issued after a plaintiff has voluntarily dismissed his complaint pursuant to Federal Rule of Civil Procedure 41(a) are void. *See, e.g.*, *Smith v. Potter*, 513 F.3d 781, 782-83 (7th Cir. 2008) ("The plaintiff [timely] dismiss[ed] her first suit [pursuant to Rule 41(a)], so the judge was not authorized to dismiss the suit with prejudice. . . . Since there was no longer a case pending . . . [the district judge's] order was void."); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1049 (9th Cir. 2001) ("The [filing of a Rule 41(a)(1)(i) notice] itself closes the file . . . and the court has no role to play. . . . [Thereafter], the district court loses jurisdiction . . . and may not address the merits of [the dismissed] claims or issue further orders pertaining to them." (first alteration in original)); *Williams v. Ezell*, 531 F.2d 1261,1264 (5th Cir. 1976) ("[Plaintiffs' voluntary dismissal] was the end of the case and the attempt to deny relief on the merits and dismiss with prejudice was void."); *see also* 8 Moore's Federal Practice § 41.33[6][e] (2008) ("Once a notice of dismissal without prejudice is filed, the court loses jurisdiction over the case, and may not address the merits of the action or issue further orders.").

than the power which at that time might have been exercised in similar circumstances by judicial tribunals." *May Dep't Stores Co. v. Bd. of Revision of Cuyahoga County*, 360 N.E.2d 697, 699 (Ohio 1977) (citing *Jones v. SEC*, 298 U.S. 1, 21-22 (1936)).[3] In *May Department Stores*, the Ohio Supreme Court noted the absence of an applicable statute or administrative rule and turned "to the practice and rules of courts" – and, in particular, Ohio Rule of Civil Procedure 41(A) – to reach its holding that a petitioner had the absolute right to voluntarily dismiss without prejudice his proceeding before a county tax board. *Ibid.*

The Dealers Act says nothing about voluntary dismissals; nor, it appears, does any other section of the Ohio Revised Code or Administrative Code dealing with the Board. Thus, following *May Department Stores*, we apply the standard reflected in Ohio Rule of Civil Procedure 41(A) by default. Consequently, we hold that Kenneth's timely withdrawal notice effected a voluntary dismissal without prejudice and divested the Board of jurisdiction, such that the Board's subsequent "Final Adjudicative Order" was legally void and without preclusive effect.

## C. Merits of Dealers Act Claim

Although the district court never addressed the merits of the Dealers Act claim in the first instance, "we are free to affirm the [district court's] judgment on any basis supported by the

---

[3] Both the United States Supreme Court in *Jones* and the Ohio Supreme Court in *May Department Stores* grounded their decision to consult the codified civil procedure rules on the fact that the voluntary dismissal standard embodied therein traces its ancestry to the common-law rule that "the right of a complainant to dismiss his bill without prejudice . . . was [a matter] of course except in certain cases" where the defendant would be prejudiced in some extraordinary way. *Jones*, 298 U.S. at 19 (quoting *City of Detroit v. Detroit City Ry. Co.*, 55 F. 569, 572 (C.C.E.D. Mich. 1893) (Taft, J.)); *see also May Dep't Stores*, 360 N.E.2d at 699.

record." *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). Because the undisputed evidence shows that plaintiffs cannot prevail on the merits of their claim, we affirm the district court's judgment on that alternative basis.

The theory behind plaintiffs' Dealers Act claim is that Mazda's "violation of the requirements set out in the Gateway Memorandum is tantamount to a violation of the Dealers [Act], because the failure to apply the [G]ateway [C]riteria (as set forth [therein]) by definition means that [Mazda's decision was not based on] 'reasonable and objective criteria fairly and objectively applied.'" Such a strict construction of Ohio Rev. Code § 4517.56 would not be in keeping with the Ohio courts' decisions interpreting the Dealers Act.

Although the Ohio courts have not construed the phrase "reasonable and objective criteria fairly and objectively applied," they have repeatedly held that a manufacturer's procedural slips are not fatal under the Dealers Act, and that the controlling inquiry always remains whether good cause existed for the manufacturer's decision. For example, in *Chrysler Corp. v. Bowshier*, a proposed transferee filed a protest with the Board claiming that Chrysler had violated the Dealers Act by failing to act on the franchisee's transfer proposal within the statutorily prescribed 30-day period. No. 01AP-921, 2002 WL 465118, at *1 (Ohio Ct. App. Mar. 28, 2002). The Court of Appeals held that the manufacturer's "failure to follow R.C. 4517.56(B)'s notice provision does not result in an automatic approval or, more precisely, in a determination that good cause does not exist to refuse to approve a proposed sale/transfer." *Id.* at *5. The court reasoned that "[i]t is clear from reading R.C. 4517.56 as a whole that the ultimate issue is whether good cause exists to refuse to approve a sale or transfer. Hence, the franchisor's failure to strictly comply with certain notice

requirements in R.C. 4517.56 *is but one factor to be considered* in determining whether good cause exists." *Ibid.* (internal citation omitted) (emphasis added); *see also Gen. Motors Corp. v. Joe O'Brien Chevrolet, Inc.*, 693 N.E.2d 317, 324 (Ohio Ct. App. 1997) ("[W]hile it was error for GMC to fail to provide the grounds for the proposed relocation [in its notice letter], whether GMC complied with the requirements of R.C. Chapter 4517 is but *one factor among many to be considered* in determining whether good cause has been established . . . ." (emphasis added)).

This case is no different. As "the ultimate issue is whether good cause exists to refuse to approve a . . . transfer," *Bowshier*, 2002 WL 465118, at *5, Mazda's failure to strictly follow its own written internal policy does not mandate judgment for plaintiffs; rather, it is merely "one factor to be considered," *ibid*. Moreover, while Mazda's deviation from the procedures prescribed in the Gateway Memorandum must be considered, viewed in context, it is at best exceedingly weak evidence of lack of good cause. The obvious reason for Mazda's policy prohibiting consideration of CSI scores based on less than twelve months of data is to protect dealers from being unfairly judged on the basis of unrepresentative periods of brief duration. Here, although Kenneth's Subaru dealership score was based on less than twelve months of data, that dealership's score after ten months was so low that it was mathematically impossible for the dealership to attain a passing score even with an additional two months of perfect performance. In other words, if twelve months of data had been available, the result could not have been different. Consequently, it cannot be argued that Mazda's evaluation of the Subaru dealership was based on an *unrepresentatively* short time frame.

Aside from the fact that Mazda deviated from its regular procedures, nothing else in the record weighs against a finding of good cause under the Dealers' Act, and two significant factors

weigh in favor of a good-cause finding.[4] First, while Mazda's suggestion that the Proposed Transfer was a "sham transfer" may be hyperbolic, Kenneth's proposed business plan contained only five short proposals for turning the dealership around, and these proposals – which did not involve relocation, significant facility upgrades or replacing *any* of Ganley, Inc.'s management team – were modest at best. Since plaintiffs' dealership was the worst performer in the entire state, these changes would almost surely strike a reasonable fact-finder as too little, too late.

Most important of all, however, is the fact that regardless of whether Ganley *père* or *fils* was the majority shareholder, the days of the franchise were numbered. If the Proposed Transfer had been approved, the pre-existing termination proceeding would not have been mooted; rather, all that Kenneth would have acquired, as the Board found during the Termination Protest, was "a gift . . . of stock in a dealership . . . subject to a termination." Every court decision addressing a franchisor's refusal to consent to a proposed transfer during the pendency of termination proceedings has come to this conclusion. *See, e.g.*, *Authorized Foreign Car Specialists of Westfield, Inc. v. Jaguar Cars, Inc.*, No. 92-cv-03760, slip op. at 4-5 (3d Cir. Nov. 16, 1998) ("[T]he most [franchisee] had to sell [to proposed transferee] was a franchise subject to [the notices of termination] and one

---

[4] Plaintiffs argue that we are prohibited from considering any additional evidence of good cause because the Dealers Act required Mazda to state its reasons in its Turn-Down Letter, but the Turn-Down Letter, they claim, did not cite any reasons for rejecting the Proposed Transfer other than Kenneth's failure to satisfy the Gateway Criteria. However, in addition to the Gateway Criteria, the Turn-Down Letter also referred to the pendency of termination proceedings. Furthermore, plaintiffs' assertion that our good-cause analysis must rely only on the reasons cited in the Turn-Down Letter is unsupported by the case law. *See Joe O'Brien Chevrolet*, 693 N.E.2d at 324 (holding that manufacturer's failure to list *any grounds whatsoever* for the proposed relocation in its letter to dealer, although a statutory violation, did not preclude a finding of good cause).

that would perforce terminate should those notices be sustained.") (construing New Jersey Franchise Practices Act) (fourth alteration in original); *Portaluppi v. Shell Oil Co.*, 869 F.2d 245, 248 (4th Cir. 1989) (holding that franchisor did not violate provision of the Virginia Petroleum Products Franchise Act providing that "[n]o transfer or assignment of a franchise by a dealer . . . shall be unreasonably disapproved" when it refused transfer that was proposed following a notice of termination, because "there was little left to transfer"); *H-D Michigan, LLC v. Sovie's Cycle Shop, Inc.*, 626 F. Supp. 2d 274, 279 (N.D.N.Y. 2009) ("[W]here, as here, [the transfer proposal] was made *after* the franchise was already the subject of a termination notice[, t]he most Sovie's had to transfer was a franchise subject to the notice of termination. . . .") (construing New York Franchised Motor Vehicle Dealer Act); *Chic Miller's Chevrolet, Inc. v. Gen. Motors Group*, 352 F. Supp. 2d 251, 258 n.9 (D. Conn. 2005) ("Even if termination has not yet taken effect, a franchisee is only entitled to transfer his interest in any period remaining.") (construing Connecticut Franchise Act); *Glenn v. Exxon Co.*, 801 F. Supp. 1290, 1297 (D. Del. 1992) ("[T]he attempted assignment occurred after the notice of termination. When Exxon refused to give consent. . . , there was 'little left to transfer.'" (quoting *Portaluppi*, 869 F.2d at 248) (construing federal Petroleum Marketing Practices Act)).

In fact, some of these cases held not just that a proposed transferee would take the franchise subject to the pre-existing termination proceedings, but also that a franchisor's rejection of a proposed transfer on the basis of pending termination proceedings is reasonable as a matter of law. *See, e.g.*, *H-D Michigan*, 626 F. Supp. 2d at 279 ("It is not unreasonable to refuse to approve the transfer of a franchise that is in the process of being terminated."). While Ohio's Dealers Act uniquely prohibits a finding of good cause *solely* on the basis of the pendency of termination

proceedings, it provides that "the [B]oard may consider [the pendency of termination proceedings] among other[ circumstances] in determining whether good cause [does or] does not exist . . . ." Ohio Rev. Code § 4517.56(E). Where, as here, the existence of good cause for the underlying *termination* is not remotely in doubt, the certainty of impending termination weighs heavily in the good-cause calculus with respect to the refusal of a proposed transfer.

In summary, taking into account the totality of the circumstances – Kenneth's marginal-at-best performance under the Gateway Criteria; the unimpressiveness of the proposed changes in light of the dealership's dire problems; and, most significantly, the fact that the franchise "would perforce terminate" once the termination notice was inevitably sustained, *Authorized Foreign Car*, No. 92-cv-03760, slip op. at 5 – we hold that no reasonable fact-finder could find that Mazda lacked good cause to refuse its consent to the Proposed Transfer.

## III. Contract Claim

Besides asserting a claim under the Dealers Act, Ganley, Inc. and Thomas[5] assert that Mazda breached the provision of the Agreement providing that consent to a transfer of a controlling interest in Ganley, Inc. "shall not be unreasonably withheld."[6] The district court did not reach the

---

[5] While Thomas is not a signatory to the Agreement, he appears to be an intended third-party beneficiary, *see Hill v. Sonitrol of Southwestern Ohio, Inc.*, 521 N.E.2d 780, 784-85 (Ohio 1988), and therefore has standing to sue under it. *Cleveland-Akron-Canton Advertising Coop. v. Physician's Weight Loss Ctrs. of Am., Inc.*, No. 92718, 2009 WL 3490756, at *4 (Ohio Ct. App. Oct. 29, 2009).

[6] Plaintiffs also asserted in their Amended Complaint that Mazda breached the Agreement by purporting to exercise its right of first refusal under circumstances where that right was not properly exercisable. However, the district court held that, while Mazda informed plaintiffs in the Turn-Down Letter that it intended to exercise its right of first refusal, it never in fact exercised it.

issue of whether Mazda in fact "unreasonably withheld" its consent, instead finding that plaintiffs would not be able to establish any damages flowing from the alleged breach. *See Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 881 (Ohio 2002) (stating that under Ohio law, a plaintiff must prove the existence of damages to succeed in a breach-of-contract claim). We agree.

Thomas clearly suffered no damages as a result of the denial of the Proposed Transfer because, had it been approved, his stated intent was to give away his interest in Ganley, Inc. *for free.*[7] Ganley, Inc., meanwhile, suffered no damages as a result of the denial because, as discussed previously, the franchise would have been terminated at the same time regardless of which Ganley was the controlling shareholder during the tail end of the termination proceedings. Any assertion that Ganley, Inc. would have become profitable under Kenneth's majority ownership during the three-to-four month window at issue would be sheer speculation, *see Jade, Inc. v. Mathews*, No. 07 CA 38, 2008 WL 4286623, at *3 (Ohio Ct. App. Sept. 15, 2008) ("A plaintiff may not recover speculative damages."), not to mention in conflict with Kenneth's admission in his proposed business plan that turning the franchise around "[would] take time."

Furthermore, as we have already determined with respect to plaintiffs' Dealers Act claim, no reasonable jury could find under these circumstances that Mazda lacked good cause to

_____

On appeal, plaintiffs do not contest this aspect of the district court's holding.

[7] Besides financial damages, Thomas also alleges that he was damaged "reputation-wise" and in terms of his "standing in the community" by the refusal of the Proposed Transfer. However, even assuming reputational damages may be recovered in an ordinary breach-of-contract action, *but see Knorr v. Reedy*, 11 Ohio Dec. Reprint 465, 1892 WL 1027, at *4-*5 (Ohio Super. Ct. 1892); Am. Jur. Damages § 109, the extent of such damages in this case would be utterly speculative.

refuse its consent to the Proposed Transfer.  As such, plaintiffs cannot establish that consent was "unreasonably withheld" under the Agreement. *See Stern v. Taft*, 361 N.E.2d 279, 280 & n.1 (Ohio Ct. App. 1976); 29 Williston on Contracts § 74:22 (4th ed.).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.