[Cite as *Frye v. Am. Honda Motor Co., Inc.*, 2024-Ohio-1554.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Kirtlund C. Frye et al., | : | |
| Appellants-Appellants, | : | No. 23AP-490 |
| v. | : | (C.P.C. No. 21CV-7084) |
| American Honda Motor Co., Inc. et al., | : | (REGULAR CALENDAR) |
| Appellees-Appellees. | : | |

D E C I S I O N

Rendered on April 23, 2024

**On brief:** *Seeley, Savidge, Ebert & Gourash Co., LPA, Keith A. Savidge*, and *Jeffrey S. Moeller*; *Morganstern, MacAdams & DeVito Co., LPA*, and *Christopher M. DeVito*, for appellants. **Argued:** *Jeffrey S. Moeller*.

**On brief:** *Stark & Knoll, Co., L.P.A., Orville L. Reed*, and *Christopher A. Tipping*; *Nelson Mullins Riley & Scarborough LLP*, and *Steven B. McFarland*, for appellee American Honda Motor Co., Inc. **Argued:** *Steven M. McFarland*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Appellants, Kirtlund C. Frye and Sunnyside Automotive, Inc., appeal from a judgment of the Franklin County Court of Common Pleas affirming the order of the Ohio Motor Vehicle Dealers Board ("Board") finding appellee American Honda Motor Co., Inc. ("Honda") had good cause to refuse to approve the transfer of a dealership to appellants. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} Frye has owned and operated Sunnyside Honda in Middleburg Heights, Ohio since 1984. Sunnyside Honda is a franchisee as defined in R.C. 4517.01(V). Frye owns other

franchise dealerships in the Cleveland, Ohio area, including dealerships for Mitsubishi, Audi, Toyota, Hyundai, and Chevrolet. Frye is the 100 percent owner of Sunnyside Automotive Inc., the entity that owns Frye's various dealerships.[1]

{¶ 3} Honda manufacturers Honda vehicles and is a franchisor as defined in R.C. 4517.01(W).[2] Sunnyside and Honda are parties to an Automobile Dealers Sales and Service Agreement ("Dealer Agreement"). The Dealer Agreement obligates the dealer to "[p]romote, sell and service Honda Products and serve American Honda customers according to the terms and conditions of th[e] Dealer Agreement." (Dealer Agreement at 2.) The Dealer Agreement states that Honda will measure the dealer's sales and/or service obligations "on the basis of such Policies and Procedures containing such reasonable criteria as American Honda may develop from time to time." (Dealer Agreement at 9.)

{¶ 4} In 2007, Honda developed its Dealer Sales Performance Evaluation Policy ("Sales Policy"). The Sales Policy states that Honda will measure a dealer's sales effectiveness through an evaluation metric known as Retail Sales Effectiveness ("RSE"). (Jt. Ex. 1 "Sales Policy.") A dealer's RSE is determined by comparing the dealer's "Expected Retail Sales to its Retail Sales." (Sales Policy at 1.) To determine a dealer's expected retail sales, Honda initially determines the market share Honda achieves in various competitive segments in the dealer's state. A competitive segment is a grouping of vehicle models that includes at least one Honda model as well as other similar vehicle models.[3] Honda then multiplies the total number of retail industry registrations in a particular competitive segment that are registered to addresses within the dealer's Area of Statistical Analysis ("ASA")[4] by Honda's statewide market share in that segment to determine the dealer's expected sales in that segment. The dealer's expected retail sales in each segment are combined to determine the dealer's total expected retail sales. The dealer's total expected retail sales are compared to the dealer's actual retail sales to determine the dealer's sales effectiveness. If a dealer sells the exact number of vehicles expected it will have an RSE of

---

[1] We will refer to Sunnyside Honda and Sunnyside Automotive, Inc. interchangeably as "Sunnyside" in this decision.

[2] Automobile manufacturers cannot sell automobiles directly to consumers. *See* R.C. 4517.59(A)(5). Therefore, manufactures rely on automobile dealers to sell their products.

[3] For instance, the Honda Civic is in the small car segment, along with vehicles such as the Toyota Corolla, Ford Focus, and Mazda 3.]

[4] A dealer's ASA consists of census tracts around the dealership that are assigned to the dealer based on their geographical proximity to the dealership.

0 percent. If the dealer sells more vehicles than expected it will have a positive RSE, and if the dealer sells less vehicles than expected it will have a negative RSE.

{¶ 5} For a dealer to be "effectively promoting and selling Honda Vehicles, as required by the Dealer Agreement, Dealer must be Sales Effective." (Sales Policy at 2.) A dealer is sales effective if their "Retail Sales are not less than Expected Retail Sales," i.e., if they have an RSE of 0 percent or higher. (Sales Policy at 2; Tr. Vol. 3 at 703.) If a dealer is not sales effective, Honda may send the dealer a letter cautioning them about their deficient sales performance. If the dealer's sales do not improve, Honda may send the dealer a notice of default and opportunity to cure and may ultimately send the dealer a notice of termination. (Sales Policy at 2.)

{¶ 6} Honda has also created a Service Retention Policy. The Service Retention Policy provides that a dealer is effectively servicing Honda vehicles pursuant to the Dealer Agreement if the dealer's actual active units in operation are not less than the dealer's expected active units in operation.[5] To be compliant with the Dealer Agreement, a dealer's service retention must be 0 percent or higher.

{¶ 7} In early 2019, Frye and Jack Matia began discussing the possibility of Frye purchasing Matia's dealership, Jack Matia Honda, located in Elyria, Ohio. Jack Matia Honda is located 20 miles from Sunnyside, and both are in the Cleveland metro area. Matia initially had concerns about the deal because he knew that Honda previously turned Frye down when he attempted to purchase an Acura dealership in 2016. In the 2016 Acura turn-down letter, Honda stated it would not approve the transfer to Sunnyside because Sunnyside's "sales performance and service retention" were "substantially below the level required by its Dealer Agreement with American Honda." (Honda Ex. 104.)[6] In 2019, Frye spoke with Gary Russo, Honda's zone manager for the Cleveland, Ohio area, about his intention to purchase the Matia dealership. Frye informed Russo that he had concerns about Honda's RSE metric, and Russo suggested that Frye document his concerns in a letter and forward the letter to Russo.

---

[5] A unit in operation is a Honda vehicle registered to an address in the dealer's ASA.
[6] The 2016 Acura turn-down letter demonstrated that Sunnyside had RSE scores of -48.31 percent in 2012, -50.46 percent in 2013, -50.97 percent in 2014, and -51.02 percent in 2015; and that Sunnyside had service retention scores of -15.63 percent in 2013, -12.35 percent in 2014, and -15.46 percent in 2015.

{¶ 8}   On May 21, 2019, Frye and Matia executed an Asset Purchase Agreement to sell Jack Matia Honda to Sunnyside.  (Russo Depo., Ex. 11 "Asset Purchase Agreement.") Frye and Matia sent the Asset Purchase Agreement to Russo, and Russo sent the Asset Purchase Agreement to Honda's corporate office on May 22, 2019.

{¶ 9}   Honda has internal guides for its corporate office to use when processing proposed dealer actions.  Honda's Package Processing Guide 101 / Dealer Candidate Evaluation Criteria ("Guide 101") sets forth criteria for Honda to use to "fairly evaluate a dealer candidate" and to determine whether "the dealer candidate has provided adequate assurances of the ability to satisfactorily perform under a Dealer Agreement."  (Jt. Ex. 3, Guide 101 at 1.)  The evaluation criteria include completion of the dealership application, the dealer's cooperation, candor, and willingness to comply with Honda policies, the dealer's experience, the dealer's performance in running a successful and profitable dealership, the dealer's financial resources, the proposed dealership operations, and the dealer's moral character.  (Guide 101 at 3-6.)  When assessing a current Honda dealer, Honda considers whether the dealer "has achieved or exceeded Retail Sales Effectiveness, and the degree to which Dealer has been above or below Retail Sales Effectiveness, and the applicable time periods."  (Guide 101 at 4.)  Guide 101 states that Honda "*may* consider" the criteria in the guide, but Honda has no duty or obligation to consider "all, or any, of those criteria" and that Honda does "not assign[] any specific weight" to the criteria in the guide.  (Emphasis sic.)  (Guide 101 at 2.)

{¶ 10} Over the years, Honda periodically sent Frye cautionary letters regarding Sunnyside's RSE.  Although Sunnyside received cautionary letters regarding its performance, it never received a notice of default or a notice of termination.

{¶ 11} On June 3, 2019, Frye submitted a letter to Russo regarding Honda's RSE metric.  Frye noted in the letter that the domestic brands, i.e., Ford, General Motors Corp. ("GM"), and Chrysler all had auto manufacturing plants located in the northern portion of Ohio, which resulted in a domestic brand preference in northern Ohio.  Frye noted that Honda had manufacturing plants in the central part of the state, which resulted in a preference for Honda vehicles in central Ohio.  Frye argued that, due to these consumer preferences, the northern Ohio Honda dealers faced "a very unfair comparable metric relative to RSE compared to dealers near auto manufacturing facilities owned by Honda"

in central Ohio. (Russo Depo., Ex. 23 "Frye June 3, 2019 Letter" at 1, 2.) Frye also asserted that northern Ohio consumers preferred pickup trucks, but Honda did not offer a full-size pickup truck, and that the presence of rental vehicles at the Cleveland airport caused "a possible influx of retail registrations in our market." (Frye June 3, 2019 Letter at 2.) Frye noted that Sunnyside participated in Honda's certified used car program, but there was no consideration of certified used sales in the RSE calculation.

{¶ 12} On June 20, 2019, Honda sent Frye and Matia a letter rejecting the proposed transfer of the Matia dealership to Sunnyside. Honda noted it had "not received all of the information and documentation required * * *, including information regarding Sunnyside's prospective management personnel," but that, based on the materials provided, it would not approve the proposed transfer. (Russo Depo., Ex. 20 "Honda Turn-Down Letter" at 1.) Honda explained Sunnyside's sales performance and service retention were "substantially below the level required by its Dealer Agreement," and that Sunnyside's facility did not comply with Honda's minimum facility requirements. (Honda Turn-Down Letter at 1.) Honda demonstrated that in 2016 Sunnyside's RSE was -45.34 percent and it ranked 46th of 48 dealers in Ohio; in 2017 Sunnyside's RSE was -50.22 percent and it ranked 46th out of 47 dealers in Ohio; and that in 2018 Sunnyside's RSE was -55.31 percent and it ranked 46th out of 47 dealers in Ohio. (Honda Turn-Down Letter at 2.)

{¶ 13} Honda further stated that, in reaching its decision, it did not rely solely on its state average RSE metric but relied on various alternative metrics. Honda noted that when it compared Sunnyside's sales performance to "either the Cleveland average or the Northeast Ohio average instead of state average, performance remain[ed] extremely poor at -39.3 and -37.8, respectively (Dec. 2018 YE), ranking last in Cleveland and 14th of 15 Northeast Ohio Honda dealers." (Honda Turn-Down Letter at 2.) Honda also calculated Sunnyside's RSE by excluding all domestic brands from the equation and found that Sunnyside's RSE for 2018 was -54.1 percent, which was the lowest of any Ohio Honda dealer. (Honda Turn-Down Letter at 2.) Honda also noted that Sunnyside's service retention scores were -14.24 percent in 2016, -10.94 percent in 2017, and -14.75 percent in 2018, and that Sunnyside's facility did not comply with Honda's image and design requirements. (Honda Turn-Down Letter at 3.) Honda concluded it could not approve the proposed transfer to Sunnyside because "approval would require American Honda to rely

on an agreement by Sunnyside to meet minimum sales performance and service retention obligations, and Sunnyside has demonstrated it is unable and/or unwilling to meet these obligations." (Honda Turn-Down Letter at 4.)

{¶ 14} After receiving the Honda turn-down letter, appellants filed a protest with the Board pursuant to R.C. 4517.56(C). A Board hearing examiner held hearings on the protest on April 19-23, 26, and 27, 2021. At the hearings, Honda's senior manager of market representation, David Adair, stated that the "overwhelming factor" in the decision to turn down the proposed transfer was Sunnyside's sales performance. (Tr. Vol. 3 at 677.) Adair explained that after Honda received Frye's June 3, 2019 letter, Honda asked Urban Science, a data analysis firm, to review the letter and respond to Frye's concerns. In response, Urban Science produced a report containing alternative RSE metrics and Honda relied on Urban Science's alternative metrics to turn down the proposed transfer to Sunnyside. Adair noted Sunnyside's performance was "extremely poor" under all the alternative metrics. (Tr. Vol. 3 at 590-91.)

{¶ 15} Adair explained that because Honda does not offer a large pickup truck in its vehicle portfolio, large trucks are not included in the RSE calculation. Adair also explained that "any sale of 10 or more units to a customer in any 12 month period" would be flagged as fleet and not included in the RSE calculation. (Tr. Vol. 2 at 571.) Adair stated he believed "a good used car operation is very beneficial to the dealership in general," because it "gets people in the store shopping."[7] (Tr. Vol. 3 at 589.)

{¶ 16} Adair acknowledged that, because RSE is calculated using state average market penetration rates, approximately half of the dealers in a given state will have a negative RSE. Honda's assistant vice president of market representation, Frank Beniche, explained that Honda considered "the degree" to which a dealer was "above or below" 0 percent RSE, because Honda did not want the "outliers out there that are significantly below." (Tr. Vol. 1 at 164.) Beniche noted that most below average dealerships had a RSE between 0 percent and -20 percent; he stated that a RSE of -55 percent was "[v]ery poor." (Tr. Vol. 1 at 124, 121.)

---

[7] Sunnyside sold the second highest volume of certified used vehicles in the Cleveland metro area in 2018. However, the Cleveland dealer with the highest volume of certified used car sales in 2018 was Honda of Mentor, and Honda of Mentor had an RSE of -6.6 percent in 2018 while Sunnyside had an RSE of -55.3 percent in 2018.

{¶ 17} Adair, Beniche, and Russo all acknowledged that Sunnyside was a profitable dealership. Adair explained that Frye's financial resources were not an issue for Honda.

{¶ 18} Honda presented the expert testimony and report of Sherif Farhat, the vice president of expert analytical services for Urban Science. Farhat acknowledged that in 2018 Honda Marysville, located near Columbus, Ohio had an RSE of +504 percent and ranked 1st of all Ohio Honda dealers, and that Lindsay Honda in Columbus, Ohio had an RSE of +156 percent and ranked second of all Ohio Honda dealers. Farhat affirmed that Honda Marysville and Lindsay Honda were "outliers." (Tr. Vol. 4 at 1243.) However, Farhat explained that by calculating Sunnyside's RSE using only northeast Ohio and Cleveland metro as the standards, Honda removed any skewing effect the central Ohio dealers may have had on Sunnyside's RSE. Farhat noted that "on every standard [he] looked at" Sunnyside performed poorly on an absolute basis, i.e., based on its low RSE, and on a relative basis, i.e., as compared to other dealers. (Tr. Vol. 5 at 1349, 1265.)

{¶ 19} Appellants presented the expert testimony and report of Patrick Anderson, from Anderson Economic Group. Anderson stated that Honda's RSE metric was unfair because it failed to consider "the strong preference for the [domestic] auto makers in" northern Ohio or the strong preference for Hondas in central Ohio. (Tr. Vol. 6 at 1640-43.) As such, Anderson stated that Honda's RSE metric had "a disparate and grossly unfair effect on Honda dealers located in the Cleveland market," because it gave the Cleveland dealers "a bar to jump across that's much, much higher than people down in" the Columbus market.[8] (Tr. Vol. 6 at 1644.) The record demonstrated that from 2016 to 2018 all the Cleveland metro Honda dealers had negative RSE, while Honda Marysville and Lindsay Honda had extremely positive RSE.

{¶ 20} Anderson noted that Sunnyside had the largest ASA in Ohio with 16,313 competitive registrations in 2018.[9] Correspondingly, Sunnyside had the highest expected retail sales of any Ohio Honda dealer, with expected sales of close to 2,900 under the state average RSE. In 2018, Honda's Ohio average market penetration rate was 17.84 percent,[10]

---

[8] However, Anderson also stated he believed Honda's June 20, 2019 turn-down letter was based on "straight RSE," and that he "[didn't] remember" if Honda considered Sunnyside's RSE under a Cleveland only standard. (Tr. Vol. 6 & 7 at 1736, 1796.)

[9] The second highest was the North Olmsted ASA with 14,785 competitive registrations. The Marysville ASA had only 2,843 competitive registrations in 2018.

[10] Meaning that for every 100 new vehicles purchased in Ohio in 2018, 17.84 were Hondas.

but Honda's average market penetration was 12.60 percent in northeast Ohio and 13.08 percent in the Cleveland metro. Farhat acknowledged that northeast Ohio and Cleveland were "more conservative or lower than the Ohio markets" for Honda. (Tr. Vol. 4 at 1249.)

{¶ 21} Anderson reviewed Sunnyside's sales volume to conclude that Sunnyside's sales exceeded the state, regional, and national average for Honda dealer sales, and that Sunnyside was consistently "near the top of the interquartile range" for Honda sales in Ohio from 2012 to 2018. (Appellants' Ex. 338, Anderson Report at 10.) Anderson demonstrated that, in 2018, Sunnyside's total retail sales were 1,296 and that Sunnyside ranked 17th of all Ohio Honda dealers for total sales.[11] Anderson also noted that Sunnyside had 23 competing dealerships, a Ford engine plant, and a GM metal center located in its ASA. Anderson concluded Honda did not have good cause to preclude Frye from operating another Honda dealership based on Sunnyside's sales performance, because Sunnyside sold "more Honda vehicles than the state average" and "dominate[d] the local market even in the face of strong inter-brand competition." (Anderson Report at 12.)

{¶ 22} On October 4, 2021, the hearing examiner issued a report and recommendation setting forth findings of fact and conclusions of law. The hearing examiner acknowledged that Honda did not review information regarding Frye's prospective management personnel, but concluded Honda did not need to review this information because Honda knew "Frye reasonably managed his dealerships and presumed * * * the Matia dealership would be similarly managed." (Report & Recommendation at 21.) The hearing examiner concluded that Sunnyside's service retention and facility imaging did not establish good cause for the turn down, and that the protest therefore "turn[ed]" on Sunnyside's past poor sales performance. (Report & Recommendation at 21.) Although the hearing examiner concluded that Honda's RSE metric "alone was not a fair metric to evaluate this proposed transfer," the hearing examiner noted that Honda "recognized as much and, as stated in the turndown letter, adjusted its RSE metric to address the various concerns Frye raised." (Report & Recommendation at 23.) The hearing examiner stated that Honda's RSE metric adjustments were fair and reasonable criteria

---

[11] Farhat explained that using a comparison based on sales volume alone was "absolutely not reasonable," because "small market dealers will sell less than large market dealers." (Tr. Vol. 8 at 2153-54.) Anderson also acknowledged that "low volume dealers in rural areas" would not be "expect[ed] * * * to sell as many cars" as a high volume dealer in a metro area such as Sunnyside. (Tr. Vol. 6 at 1600.)

which were fairly and objectively applied to Sunnyside, and that Sunnyside's sales performance "across each adjusted metric, were below Honda's expectations." (Report & Recommendation at 24.) As such, the hearing examiner found that Honda had good cause to refuse the proposed transfer of the Matia dealership to Sunnyside and recommended the Board overrule appellants' protest.

{¶ 23} On November 4, 2021, the Board adopted the hearing examiner's recommendation by inaction. *See* R.C. 4517.58 (stating that if the Board "fails to act within thirty days after the board receives a proposed decision from the hearing officer * * * the proposed decision shall be considered approved"). Appellants filed a timely R.C. 119.12 appeal of the Board's order to the common pleas court. On January 31, 2022, appellants filed a brief in the common pleas court asserting the commission's order was not based on reliable, probative, or substantial evidence and was not in accordance with law. Honda filed a brief responding to appellants' arguments on February 14, 2022. On July 28, 2023, the common pleas court issued a decision and entry affirming the Board's order.

## II. Assignments of Error

{¶ 24} Appellants appeal and assign the following three assignments of error for our review:

> [I.] The trial court erred as a matter of law and/or abused its discretion by allowing an automobile manufacturer to refuse the transfer of an existing franchise without weighing or considering all of the statutorily mandated factors for consideration under R.C. 4517.56(A) for such a request.

> [II.] The trial court erred as a matter of law and/or abused its discretion by allowing an automobile manufacturer to refuse the transfer of an existing franchise based only on its dissatisfaction with the transferee's achievement of the manufacturer's aspirational sales goals in a different market area.

> [III.] Assuming that looking solely at a prospective transferee's achievement of reasonable and objective sales goals in another market could be sufficient analysis by an automobile manufacturer of a transfer application under R.C. 4517.56(A), then the trial court abused its discretion by finding that the manufacturer's review fairly and objectively measured the applicant's performance.

### III. Standard of Review

{¶ 25} In an administrative appeal, pursuant to R.C. 119.12, the common pleas court must consider the entire record to determine whether reliable, probative, and substantial evidence supports the agency's order and whether the order is in accordance with law. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 110-11 (1980). Reliable, probative, and substantial evidence has been defined as follows:

> (1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.

(Footnotes omitted.) *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992).

{¶ 26} The common pleas court's "review of the administrative record is neither a trial *de novo* nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (1st Dist.1981), quoting *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280 (1955). The common pleas court "must give due deference to the administrative resolution of evidentiary conflicts," although "the findings of the agency are by no means conclusive." *Conrad* at 111. The common pleas court conducts a de novo review of questions of law. *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993), citing R.C. 119.12.

{¶ 27} An appellate court's review of an administrative decision is more limited than that of the common pleas court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). The appellate court is to determine only whether the common pleas court abused its discretion. *Id.*; *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 261 (1988). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). *See Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). Absent an abuse of discretion, this court may not substitute its judgment for that of the administrative

agency or the common pleas court. *Pons* at 621. However, on the question of whether the agency's order was in accordance with the law, this court's review is plenary. *Kistler v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 04AP-1095, 2006-Ohio-3308, ¶ 9, citing *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 343 (1992).

## IV. First Assignment of Error - R.C. 4517.56(A)

{¶ 28} Appellants' first assignment of error asserts the common pleas court erred by approving the Board's order because Honda failed to consider all the factors in R.C. 4517.56(A) before turning down the proposed transfer to Sunnyside. Appellants contend that Honda acted contrary to R.C. 4517.56(A) because it failed to evaluate Frye's prospective management personnel for the new dealership. The common pleas court concluded that information regarding the proposed management personnel "would not have altered [Honda's] decision to turn down the transfer due to [Sunnyside's past] poor [sales] performance." (Decision at 25.)

{¶ 29} R.C. 4517.56(A) provides that if a current automobile dealer proposes to sell or transfer their dealership to another dealer, and the proposed transferee indicates a willingness to comply with all of the requirements of the franchise then in effect, "the franchisee shall notify the franchisor of such intention by written notice setting forth the prospective transferee's name and address and the names and addresses of the transferee's prospective management personnel." R.C. 4517.56(A) further provides that:

> The franchisee and prospective transferee shall also supply the franchisor with such other information regarding the transferee's character, business experience, and financial ability as may be reasonably requested by the franchisor to enable it to evaluate the transferee's qualifications and ability to comply with the requirements of the franchise then in effect. The franchisor shall evaluate the prospective transferee and the transferee's prospective management personnel on the basis of reasonable and objective criteria fairly and objectively applied.

{¶ 30} If a franchisor intends to turn down the proposed transfer, the franchisor must provide the franchisee and prospective transferee with "written notice by certified mail of any refusal to approve a sale or transfer * * * within thirty days of receipt of the

written notice advising of the proposed transfer."[12]  R.C. 4517.56(B).  The franchisor's turn-down notice must "specify the objective criteria used to evaluate the prospective transferee and the criteria which the transferee failed to meet." R.C. 4517.56(B).  The franchisee or prospective transferee may file a protest with the Board within 90 days after receipt of the franchisor's notice of refusal.  R.C. 4517.56(C).

{¶ 31} At the hearing on the protest the franchisor has the burden "of going forward and of persuasion to establish that there [was] good cause" for the franchisor to refuse to approve the transfer.  R.C. 4517.57(C).[13]  If the Board determines the franchisor did not have good cause to refuse to approve the sale or transfer, the franchisor "shall not fail or refuse to approve the sale or transfer."  R.C. 4517.56(D).  The provisions of R.C. Chapter 4517 must be "liberally construed in order to ensure a sound system for distributing and selling motor vehicles." *See Nissan Motor Corp., U.S.A. v. Dever*, 10th Dist. No. 99AP-596 (Mar. 28, 2000) (stating that one of the purposes of R.C. 4517.56 is to "provide protection to franchisees and proposed transferees from arbitrary decisions of franchisors").[14]

{¶ 32} Appellants argue that R.C. 4517.56(A) obligated Honda to evaluate both Frye and Frye's prospective management personnel.  (Appellants' Brief at 28.) Statutory interpretation is a question of law subject to de novo review.  *Knollman-Wade Holdings, L.L.C. v. Platinum Ridge Properties, L.L.C.*, 10th Dist. No. 14AP-595, 2015-Ohio-1619, ¶ 13, citing *State v. Banks*, 10th Dist. No. 11AP-69, 2011-Ohio-4252, ¶ 13.  The primary goal of statutory interpretation is to ascertain and give effect to the General Assembly's intent in enacting the statute.  *Brooks Capital Servs., L.L.C. v. 5151 Trabue Ltd.*, 10th Dist. No. 12AP-30, 2012-Ohio-4539, ¶ 16, citing *Yonkings v. Wilkinson*, 86 Ohio St.3d 225, 227 (1999).  In

---

[12] Adair noted that Honda "reacted pretty quickly" to the proposed transfer in the present case because it "knew we were kind of under this Ohio timeline of 30 days to, you know, to be able to review and approve or turn down." (Tr. Vol. 3 at 856-57.) This court has observed that, pursuant to R.C. 4517.56(A) and (B), the franchisor must provide written notice of its refusal within 30 days "of receiving the written notice which sets forth the names and addresses of the prospective transferee and the transferee's prospective management personnel." *Chrysler Corp. v. Bowshier*, 10th Dist. No. 01AP-921 (Mar. 28, 2002). If a prospective transferee changes its prospective management personnel following the initial communication with the franchisor the revision will "not toll the triggering of the 30-day notice requirement in R.C. 4517.56(B)." *Id.*

[13] R.C. 4517.56(E) identifies circumstances that "do not constitute sufficient good cause for failing to approve a sale or transfer," although the Board may consider the circumstances "in determining whether good cause does not exist for the franchisor to fail or refuse to approve such a sale or transfer."

[14] If the Board finds in favor of the protesting franchisee or prospective transferee, the franchisor will be liable to the franchisee or prospective transferee for reasonable attorney fees. R.C. 4517.65(C). "R.C. 4517.65(C) is a remedial statute, with the purpose of deterring manufactures from using their vast resources to outspend opponents." *Lally v. Am. Isuzu Motors, Inc.*, 10th Dist. No. 05AP-1137, 2006-Ohio-3315, ¶ 22.

determining legislative intent, we first look to the plain language of the statute. *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, ¶ 11, citing *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81 (1997). A court must "evaluate a statute 'as a whole and giv[e] such interpretation as will give effect to every word and clause in it.' " *Boley v. Goodyear Tire & Rubber Co.*, 125 Ohio St.3d 510, 2010-Ohio-2550, ¶ 21, quoting *State ex rel. Myers v. Bd. of Edn. of Rural School Dist. of Spencer Twp.*, 95 Ohio St. 367, 373 (1917). *See* R.C. 1.47(B).

{¶ 33} R.C. 4517.56(A) states that "the franchisee shall notify the franchisor" of a proposed transfer "by written notice setting forth the * * * names and addresses of the transferee's prospective management personnel." Accordingly, R.C. 4517.56(A) obligates the franchisee to provide the franchisor with information regarding the transferee's prospective management personnel in the first instance. While R.C. 4517.56(A) obligates the franchisor to evaluate "the prospective transferee and the transferee's prospective management personnel on the basis of reasonable and objective criteria fairly and objectively applied," the franchisor can only evaluate the information provided to it.

{¶ 34} The record demonstrates that neither Matia nor Frye provided the names and addresses of Frye's prospective management personnel to Honda as required by R.C. 4517.56(A). After Frye submitted the Asset Purchase Agreement to Honda, Honda requested, and Frye produced, a document detailing his marketing plan for the new dealership. Frye stated in the marketing plan that "[r]elative to the management and staffing of the dealership, we plan on incorporating many of the current employees into our new opportunity," and that he was "close to selecting a general manager who will lead the team." (Pltfs.' Ex. 309.) However, the marketing plan did not identify any management personnel for the new dealership.

{¶ 35} Adair affirmed that Honda did not receive or assess any information regarding the prospective management personnel for the Matia dealership. Adair acknowledged that Honda did not have a complete application package in this case but stated that Honda "believed [it] had an adequate amount of information to make our decision."[15] (Tr. Vol. 3 at 718.) Beniche explained that after Honda began reviewing a

---

[15] Notably, when Honda turned Frye down for the Acura dealership in 2016, it also had "not received all of the information and documentation it requested, including information regarding Sunnyside's prospective management personnel." (Honda Ex. 104 Acura Turn-Down letter.)

dealership transfer application, it could "do a left-hand turn and not go through the whole process" if it saw something that "create[d] red flags for us." (Tr. Vol. 1 at 146-47.) Adair noted that while all the information identified in the processing guides was necessary "for [Honda] to complete the transaction * * * and activate a new dealer," some of the information was unnecessary if Honda already had grounds to turn down the proposed transfer. (Tr. Vol. 3 at 712, 715.)

{¶ 36} Because neither Matia nor Frye provided Honda with information regarding Frye's prospective management personnel, Honda reasonably evaluated the information it had regarding Frye and Sunnyside. Honda turned down the proposed transfer because it found Sunnyside's poor sales performance demonstrated Frye was unlikely to comply with the requirements of the Dealer Agreement then in effect at Matia Honda. Appellants never identified who they intended to have manage the Matia dealership following the transfer.

{¶ 37} This court has found it "clear from reading R.C. 4517.56 as a whole that the ultimate issue is whether good cause exists to refuse to approve a sale or transfer." *Chrysler Corp. v. Bowshier*, 10th Dist. No. 01AP-921 (Mar. 28, 2002). Therefore, a "franchisor's failure to strictly comply with certain notice requirements in R.C. 4517.56[(B)] is but one factor to be considered in determining whether good cause exists." *Id. Accord Ganley v. Mazda Motor of Am., Inc.*, 367 Fed.Appx. 616, 624 (6th Cir.2010) (stating that "a manufacturer's procedural slips are not fatal under [R.C. Chapter 4517], and * * * the controlling inquiry always remains whether good cause existed for the manufacturer's decision"). To sustain a protest based on a franchisor's untimely notice under R.C. 4517.56(B), "prejudice must be shown." *Bowshier. Accord Dever* (explaining that a prospective transferee must demonstrate prejudice resulting from untimely notice under R.C. 4517.56(B) because "[t]o hold otherwise would be to put the method of the procedure above the main purposes of R.C. 4517.56").

{¶ 38} Appellants have not demonstrated that, if they had provided Honda with information regarding their prospective management personnel, Honda's decision to turn down the proposed transfer due to Sunnyside's past poor sales performance would have differed. As such, assuming arguendo, even if we were to consider as error Honda's failure to consider prospective management personnel information that was never provided, we would find that appellants did not establish prejudice resulting from Honda's failure to

evaluate Frye's prospective management personnel. *Compare Flynn v. State Med. Bd. of Ohio*, 10th Dist. No. 16AP-29, 2016-Ohio-5903, ¶ 52 (noting that the appellant's "vague allegations of prejudice [were] insufficient to support her claim of a due process violation").

{¶ 39} Based on the foregoing, we overrule appellants' first assignment of error.

**V. Second & Third Assignments of Error - Sales Performance**

{¶ 40} Appellants' second assignment of error asserts the common pleas court erred by upholding a Board decision which allowed a franchisor to turn down a proposed transfer based only on the franchisor's dissatisfaction with the transferee's achievement of aspirational sales goals. Appellants' third assignment of error asserts that, even if a franchisor could rely on a transferee's achievement of sales goals to turn down a proposed transfer, the common pleas court erred by finding that Honda's RSE metric fairly and objectively measured Sunnyside's sales performance in the present case. Appellants' second and third assignments of error collectively assert that Honda could not rely on its RSE metric to turn down the proposed transfer to Sunnyside. As such, we will address these assignments of error jointly.

{¶ 41} The common pleas court noted that Sunnyside's RSE scores were "significantly below expected levels under the standard metrics" and "significantly below expected levels under the adjusted metrics." (Decision at 22.) As such, the court determined that reliable, probative, and substantial evidence supported the Board's order because "Sunnyside's past sales performance was poor and evidenced its inability to comply with the requirements of the franchise agreement." (Decision at 25.)

{¶ 42} Appellants contend that Honda's use of its RSE metric was neither fair nor objective because the metric "consistently failed, year in and year out, all seven Cleveland metro Honda dealers,"[16] and "assume[d] that people in Cleveland want to buy more Hondas than they ever historically have." (Appellants' Brief at 35, 47.) Appellants argue Honda's state based RSE metric failed to consider a dealer's actual sales volume and failed to account

---

[16] While appellants correctly note that all the Cleveland dealers had negative RSE under the state average metric, the degree of negativity differed among the Cleveland dealers. For instance, in 2018, Honda of Mentor had an RSE of -6.6 percent and Jay Honda of Bedford had an RSE of -16.7 percent, while Sunnyside had an RSE of -55.3 percent. Beniche and Adair both explained that Honda did not consider every dealer with a negative RSE to be in breach of their Dealer Agreement, as Honda considered the "relativeness to where they are within the local, state." (Tr. Vol. 1 at 634.) Adair affirmed that dealers with a negative RSE could be approved for a dealership transfer.

for local market conditions. (Appellants' Brief at 55.) Appellants note that other states "have disallowed this type of 'performance against a statewide average' " evaluation metric. (Appellants' Brief at 36.) *See Beck Chevrolet Co., Inc. v. Gen. Motors, L.L.C.*, 27 N.Y.3d 379, 390-92 (Ct.App.NY 2016) (holding that, to comply with New York Vehicle and Traffic Law Section 463(2)(gg), "if [the] franchisor intends to measure a dealer's performance based on a comparison to statewide data for other dealers, then the comparison data must take into account the market-based challenges that affect dealer success").

{¶ 43} R.C. 4517.56(A) required Honda to evaluate Frye's "qualifications and ability to comply with the requirements of the franchise then in effect" on the basis of "reasonable and objective criteria fairly and objectively applied." Honda had the burden of persuasion to establish that it had good cause to refuse to approve the transfer. R.C. 4517.57(C). The "Board's determination of whether a franchisor has met its burden of persuasion" to establish good cause must be read "in light of the specifications of R.C. 4517.56(A) that the franchisor evaluate the proposed transferee's 'qualifications and ability to comply with the requirements of the franchise then in effect * * * on the basis of reasonable and objective criteria fairly and objectively applied.' " *BMW of N. Am., L.L.C. v. MacLean*, 10th Dist. No. 20AP-326, 2021-Ohio-2388, ¶ 25, quoting R.C. 4517.57(A) and (C).[17] Accordingly, "a franchisor may disapprove a franchise transfer only for good cause, after evaluating the prospective transferee's qualifications and ability to comply with the franchise." *Lally v. Am. Isuzu Motors, Inc.*, 10th Dist. No. 05AP-1137, 2006-Ohio-3315, ¶ 43.

{¶ 44} Honda's Dealer Agreement, in effect at both Sunnyside Honda and Matia Honda, obligates a Honda franchisee to effectively promote and sell Honda products as measured by Honda's policies. Honda's Sales Policy states that, for a dealer to be effectively promoting and selling Honda vehicles under the Dealer Agreement, the dealer must be sales effective under Honda's RSE metric.

{¶ 45} A franchisor's "mere incantation of its chosen benchmarking criteria" cannot "straightjacket the Board in its statutorily required evaluation of whether [a manufacturer]

---

[17] In *MacLean*, the Board determined that the manufacturer did not establish good cause to turn down a proposed transfer. The prospective transferee, MacLean, became the general manager of the relevant dealership only 11 months before the proposed transfer, and we observed that the manufacturer's attempt to "lay [the dealership's] failings at Mr. MacLean's feet after he'd started on the job would not be reasonable under these circumstances." *Id.* at ¶ 25.

showed that those articulated criteria were objective and reasonable and fairly and objectively applied" under R.C. 4517.56. *MacLean* at ¶ 27. However, "under appropriate circumstances, metrics reflecting poor performance by a prospective transferee [can] indeed supply a sufficient basis for refusing an ownership transfer." *Id.* at ¶ 27. *See Akron Falls Cars, Inc. v. U.S. Suzuki Motor Corp.*, 9th Dist. No. 10252 (Dec. 16, 1981) (finding that the franchisor demonstrated "good cause for refusing to approve the transfer" because, among other reasons, the prospective transferee's sales "in the Cleveland area decreased by 47% while the combined sales of the other two [franchisees] in the same area increased by 140.8% during the same period"). *Compare Sims v. Nissan North Am., Inc.*, 10th Dist. No. 12AP-833, 2013-Ohio-2662, ¶ 13, 18 (determining that the manufacturer could not rely on its region-based sales performance metric to terminate a dealer, because the metric failed to "take[] into consideration the [dealer's] local market condition," which included "an exceptionally large GM market share because of the presence of the Lordstown GM facility" in the dealer's area).

{¶ 46} In the present case, the hearing examiner concluded that Honda's RSE metric alone was an unfair evaluation metric. (Report & Recommendation at 23.) Indeed, because Honda's average sales penetration rate in the Cleveland metro area was over four percentage points below Honda's statewide average, calculating the Cleveland dealers' expected retail sales based on the state average necessarily resulted in an extremely high sales bar for the Cleveland dealers to achieve. However, the record demonstrates that Honda did not rely solely on its state average RSE to turn down the proposed transfer to Sunnyside.

{¶ 47} Honda also calculated Sunnyside's RSE using only northeast Ohio and Cleveland metro, respectively, as the standards for determining Honda's average market penetration. Under the statewide standard Sunnyside had a -55.3 percent RSE in 2018 and ranked 46th of 47 Honda dealers; under the northeast Ohio standard Sunnyside had a -37.8 percent RSE in 2018 and ranked 14th of 15 Honda dealers; and under the Cleveland metro standard Sunnyside had a -39.3 percent RSE in 2018 and ranked 7th of 7 Honda dealers. Adair noted that, although Sunnyside's RSE went from the -50 percent range to the -30 percent range under the local metrics, Sunnyside still "ranked dead last" among the Cleveland dealers and next to last among the northeast Ohio dealers. (Tr. Vol. 3 at 871.)

*See Brown Motor Sales Co. v. Hyundai Motor Am.*, 10th Dist. No. 10AP-725, 2011-Ohio-5053, ¶ 32 (finding good cause for a dealer termination where the evidence demonstrated that the dealer's sales efficiency numbers were low and that "[i]n a comparison of [the] appellant to other Ohio dealers, [the] appellant ranked '[a]t the bottom' "). *Id.*, quoting Transcript of Proceedings at 27.

{¶ 48} While appellants correctly note that all Cleveland dealers had a negative RSE under the state average calculation, under the northeast Ohio average 7 of the 15 dealers had positive RSE and under the Cleveland average 4 of the 7 dealers had positive RSE. Farhat noted that it was important to consider Sunnyside's sales performance trend under the local metrics, because Sunnyside's trend demonstrated it was "declining or losing ground relative to" the other northeast Ohio and Cleveland dealers. (Tr. Vol. 5 at 1293.) Sunnyside's RSE under the northeast Ohio standard was -28.2 percent in 2016 and it ranked 13th of 15; -33.9 percent in 2017 and it ranked 14th of 15; and -37.8 percent in 2018 and it ranked 14th of 15. Sunnyside's RSE under the Cleveland standard was -30.6 percent in 2016, -35.8 percent in 2017, and -39.3 percent in 2018; and it ranked 7th of the 7 Cleveland dealers each year.

{¶ 49} Honda also calculated Sunnyside's RSE by removing all domestic brands from equation to respond to Frye's concern of a domestic brand preference. Under the domestics removed equations, Sunnyside's 2018 RSE was -54.1 percent in the state, -38.3 percent in northeast Ohio, and -35.6 percent in Cleveland metro. Sunnyside ranked last among all dealers under each of the domestics removed calculations. Farhat explained that, if there was a large domestic preference in Sunnyside's ASA, Sunnyside's rank "would go up" after the domestic vehicles were removed from the equation. (Tr. Vol. 5 at 1301.)

{¶ 50} The common pleas court noted that even considering Sunnyside's sales volume, the data showed a decline in sales from 2016 to 2018. (Decision at 24.) Sunnyside sold 1,664 new vehicles in 2016, 1,506 new vehicles in 2017, and 1,296 new vehicles in 2018. Anderson affirmed that Sunnyside's sales declined by roughly 23 percent over that period. Furthermore, while Sunnyside's ASA had the highest number of competitive registrations of any ASA in Ohio, Sunnyside ranked only 17th of the Ohio dealers in total new vehicle sales in 2018.

{¶ 51} By focusing on Sunnyside's sales performance as compared to the other northeast Ohio and Cleveland metro dealers, Honda removed any potential skewing effect the central Ohio Honda dealers had on Sunnyside's RSE and adequately considered Sunnyside's local market conditions. Anderson acknowledged it was reasonable to compare dealers within northeast Ohio and the Cleveland metro to each other because these dealers faced the "same kind of consumers, meaning same kind of jobs, same kind of weather, same kind of buying patterns." (Tr. Vol. 6 at 1655-56.) Honda reasonably relied on Sunnyside's sales performance at its current Honda dealership as an indication of how Sunnyside would perform under the Dealer Agreement then in effect at Matia Honda.

{¶ 52} Honda's adjusted RSE metrics, which accounted for local market conditions, constituted reliable, probative, and substantial evidence demonstrating that Honda had good cause to turn down the proposed transfer to Sunnyside. Therefore, the common pleas court did not abuse its discretion by affirming the Board's order.

{¶ 53} Based on the foregoing, appellants' second and third assignments of error are overruled.

## VI. Conclusion

{¶ 54} Having overruled appellants' three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and JAMISON, JJ., concur.

_____